ROB BONTA
Attorney General of California
LAURA J. ZUCKERMAN (SBN 161896)
Supervising Deputy Attorney General
TARA MUELLER (SBN 161536)
JENNIFER LODA (SBN 284889)
HEATHER M. LEWIS (SBN 291933)
SUSANA AGUILERA (SBN 341788)
Deputy Attorneys General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-3433
Fax: (510) 622-2270
E-mail: Jennifer.Loda@doj.ca.gov

*Attorneys for Plaintiff State of California*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts
MICHELE HUNTON*
ZEUS SMITH*
Assistant Attorneys General
Office of the Attorney General
Environmental Protection Division
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
E-mail: Michele.Hunton@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

*(Additional counsel listed on signature page)*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

COMMONWEALTH OF MASSACHUSETTS, STATE OF CALIFORNIA, STATE OF MARYLAND, STATE OF WASHINGTON, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF HAWAIʻI, STATE OF ILLINOIS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WISCONSIN, COMMONWEALTH OF VIRGINIA, and DISTRICT OF COLUMBIA,

Plaintiffs,

v.

UNITED STATES FISH AND WILDLIFE SERVICE, BRIAN NESVIK, Director of the U.S. Fish and Wildlife Service, DOUG BURGUM, U.S. Secretary of the Interior, and KEVIN LILLY, Principal Deputy for Fish and Wildlife and Parks,

Defendants.

Case No. 4:26-cv-10072

**COMPLAINT FOR DECLARATORY RELIEF**

**(Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*)**

## INTRODUCTION

1. State Plaintiffs[1] bring this action to challenge the decision by the Secretary of the Interior, acting through the United States Fish & Wildlife Service ("FWS"), to promulgate two separate final rules—the 4(d) Rule and the Habitat Exclusion Rule—that implement the Federal Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–44.

2. The first rule, which involves changes to two regulations pertaining to animals and plants, rescinds FWS's prior regulation automatically extending the longstanding "take" and other prohibitions of Section 9 of the ESA to all newly listed threatened species. *See* Endangered and Threatened Wildlife and Plants; Regulations Pertaining to Endangered and Threatened Wildlife and Plants, 91 Fed. Reg. 45,723 (July 21, 2026) (50 C.F.R. § 17.31 applies to threatened fish and wildlife species and 50 C.F.R. § 17.71 applies to threatened plant species) (together, the "4(d) Rule").

3. The second rule creates a new process for excluding areas of critical habitat from critical habitat designations, which could result in significantly more areas being excluded from such designations and eliminating associated protections for these areas under Section 7 and other provisions of the ESA. *See* Endangered and Threatened Wildlife and Plants; Regulations for Designating Critical Habitat, 91 Fed. Reg. 45,662 (July 21, 2026) ("Habitat Exclusion Rule") (the Habitat Exclusion Rule and the 4(d) Rule, collectively, the "Final Rules").

---

[1] State Plaintiffs are the Commonwealth of Massachusetts, acting through Attorney General Andrea Campbell; State of California, acting through Attorney General Rob Bonta; State of Maryland, acting through Attorney General Anthony G. Brown; State of Washington, acting through Attorney General Nick Brown; State of Arizona, acting through Attorney General Kristin K. Mayes; State of Colorado, acting through Attorney General Philip J. Weiser; State of Connecticut, acting through Attorney General William Tong; State of Delaware, acting through Attorney General Kathleen Jennings; State of Hawaiʻi, acting through Attorney General Anne Lopez; State of Illinois, acting through Attorney General Kwame Raoul; State of Michigan, acting through Attorney General Dana Nessel; State of Minnesota, acting through Attorney General Keith Ellison; State of New Jersey, acting through Attorney General Jennifer Davenport; State of New Mexico, acting through Attorney General Raúl Torrez; State of New York, acting through Attorney General Letitia James; State of Oregon, acting through Attorney General Dan Rayfield; State of Rhode Island, acting through Attorney General Peter F. Neronha; State of Vermont, acting through Attorney General Charity R. Clark; State of Wisconsin, acting through Attorney General Joshua L. Kaul; Commonwealth of Virginia, acting through Attorney General Jay Jones; and District of Columbia, acting through Attorney General Brian L. Schwalb.

4. The Final Rules violate key requirements of the ESA, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–47.

5. Congress enacted the ESA nearly fifty-five years ago in a bipartisan effort "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) ("*TVA v. Hill*"); *see* 16 U.S.C. § 1531(a). The ESA accordingly enshrines a national policy of "institutionalized caution" in recognition of the "overriding need to *devote whatever effort and resources [are] necessary* to avoid further diminution of national and worldwide wildlife resources." *TVA v. Hill*, 437 U.S. at 177, 194 (cleaned up) (emphasis in original). The ESA constitutes "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180. The fundamental purposes of the ESA are "to provide a means whereby *the ecosystems* upon which endangered species and threatened species depend may be conserved, [and] to provide a program for [their] conservation." 16 U.S.C. § 1531(b) (emphasis added). The ESA defines "conserve" broadly as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," i.e., to the point of full recovery. *Id.* § 1532(3).

6. Since its passage in 1973, the ESA has served as our nation's most effective species conservation tool. Indeed, ninety-nine percent of species protected by the ESA have avoided extinction. Multiple species on the brink of extinction have seen dramatic population increases since the ESA's enactment, including the black footed ferret (*Mustela nigripes*), the California condor (*Gymnogyps californianus*), the whooping crane (*Grus americana*), and the shortnose sturgeon (*Acipenser brevirostrum*), and the ESA has resulted in the successful recovery and delisting of several species, including our national symbol, the bald eagle (*Haliaeetus leucocephalus*), as well as the American peregrine falcon (*Falco peregrinus anatum*), the Kirtland's warbler (*Setophaga kirtlandii*), and the American alligator (*Alligator mississippiensis*). ESA protections for critical habitat have been, and remain, a fundamental part of species recovery. For example, without a critical habitat designation and careful consideration of how

habitat availability and quality affected the population, the extraordinary recovery of the Sierra Nevada population segment of the bighorn sheep (*Ovis canadensis sierrae*) could never have been accomplished.

7. With the Final Rules, however, FWS erodes its ability to carry out its statutory duty to conserve our nation's endangered and threatened species based on specious and arbitrary rationales. With both Final Rules, FWS is essentially reversing rules that FWS adopted in 2022 (Habitat Exclusion Rule) and 2024 (4(d) Rule) that themselves reversed rules that FWS adopted in 2020 and 2019, respectively. Despite these continually vacillating positions, FWS fails to provide a reasoned explanation for why it is yet again changing its position.

8. When FWS first proposed the Final Rules on November 21, 2025, it made clear that they were deregulatory actions motivated by Executive Orders targeting alleged regulatory burdens, not by a desire to advance the conservation of threatened and endangered species. Indeed, FWS stated that it was proposing the Final Rules in response to an Executive Order requiring all departments and agencies to review agency actions that impose an undue "burden on the identification, development, or use of domestic energy resources." 90 Fed. Reg. 52,592, 52,593 (Nov. 21, 2025); 90 Fed. Reg. 52,587, 52,588 (Nov. 21, 2025). Now, in the Final Rules, FWS attempts to recharacterize its actions as efforts to provide greater transparency and certainty, and, for the 4(d) Rule specifically, to "thoughtfully consider the protections that are necessary and advisable for the conservation of each threatened species." *See, e.g.*, 91 Fed. Reg. at 45,724, 45,732; 91 Fed. Reg. at 45,662, 45,665, 45,672. But the opposite is true: the Final Rules eliminate precautionary protections for our country's most vulnerable species and the critical habitat upon which they depend.

9. The 4(d) Rule unlawfully and arbitrarily repeals the former rule—in effect for almost the entirety of the ESA's history—that automatically extended all Section 9 "take" and other prohibitions applicable to endangered species to all newly listed threatened species on a blanket basis, unless and until a species-specific 4(d) rule was later promulgated. FWS's longstanding approach—called the "blanket 4(d) rule"—implemented the ESA's overarching conservation purposes by ensuring that all newly listed threatened species were afforded Section 9 protections

immediately upon listing. But now, because FWS has terminated the automatic extension of these Section 9 protections to newly listed threatened species, those species, including those downlisted from endangered to threatened status, are left with no Section 9 protections, unless and until FWS promulgates a species-specific 4(d) rule. And without a deadline by which FWS must issue a species-specific rule, newly listed threatened species may be left without Section 9 protections for long periods of time. Alternatively, FWS will delay final listing of the species until it can complete the time-consuming task of developing a species-specific rule—potentially years later. 91 Fed. Reg. at 45,725. Further, under the 4(d) Rule, the promulgation of such a species-specific 4(d) rule is now even less likely—resulting in some newly listed species *never* receiving Section 9 protections—because FWS has adopted a new requirement that all 4(d) species-specific rules must be "necessary and advisable to provide for the conservation of that species," an analysis which FWS clarified includes a consideration of the *economic* impacts of protecting species from "take." *Id.* at 45,725.

10. The prior blanket 4(d) rule's automatic extension of all Section 9 "take" and other prohibitions applicable to endangered species to newly listed threatened species was consistent with the "best reading" of the ESA, *see Loper Bright v. Raimondo*, 603 U.S. 369, 400 (2024) ("*Loper Bright*"), because it constituted an exercise of FWS's discretion that adhered to the ESA's conservation purpose and mandate. *See* 16 U.S.C. §§ 1531(b) & (c), 1536(a)(1). In contrast, the final 4(d) Rule leaves threatened species without protection necessary for their recovery and substantially increases the risk that they will become endangered. Additionally, the 4(d) Rule's requirement that each species-specific rule include a necessary and advisable determination that includes both conservation *and economic* impacts is contrary to the plain language of Section 4(d), which directs that regulations protecting threatened species be "necessary and advisable to provide for the *conservation* of such species," 16 U.S.C. § 1533(d) (emphasis added), leaving no room for the consideration of economic impacts. Section 4(d) requires the Secretary of the Interior, acting through FWS, to promulgate such protective regulations "as he deems necessary and advisable to provide for the conservation of" threatened species, and also provides that, in doing so, the Secretary "may" extend Section 9 protections to

threatened species. 16 U.S.C. § 1533(d). Thus, the "best reading" of Section 4(d) is that it delegates discretionary authority to FWS, consistent with the ESA's conservation mandate and purpose. The Court's role is to ensure the agency "has engaged in reasoned decisionmaking" when exercising this delegated authority. *See Loper Bright*, 603 U.S. at 395 (cleaned up).

11. The 4(d) Rule also is arbitrary and capricious because it constitutes a radical departure from the longstanding, conservation-based agency policy and practice of providing default Section 9 protections to all newly listed threatened species, without any reasoned explanation for the drastic change it effectuates. FWS wholly disregards the prior findings it made in reinstating the blanket 4(d) rule in 2024—specifically, that the blanket 4(d) rule was a "superior choice" to "ensure[] [that] there is never a lapse in threatened species protections," Endangered and Threatened Wildlife and Plants; Regulations Pertaining to Endangered and Threatened Wildlife and Plants, 89 Fed. Reg. 23,919, 23,921 (Apr. 5, 2024) (the "2024 4(d) Rule")—and fails to adequately consider the consequences of the 4(d) Rule for species conservation. In sum, the 4(d) Rule does not reflect the "reasoned decisionmaking" the APA demands. *Michigan v. Env't Prot. Agency*, 576 U.S. 743, 750 (2015); *Loper Bright*, 603 U.S. at 395.

12. The Habitat Exclusion Rule creates a process that is likely to result in FWS's exclusion of more areas from critical habitat designations and associated protections under Section 7 and other provisions of the ESA. *See* 16 U.S.C. §§ 1531(b), (c)(1), 1532(3), (5). The Habitat Exclusion Rule *mandates* that FWS conduct an exclusion analysis whenever the proponent of exclusion puts forth "credible information" supporting exclusion and generally requires FWS to defer to outside parties instead of relying on its own extensive expertise. 91 Fed. Reg. at 45,682. The Habitat Exclusion Rule also requires FWS to prepare a draft economic impact analysis for every proposed critical habitat designation, which FWS must use to assist in identifying areas that FWS "has reason to consider for exclusion." *Id*. The Rule also requires, *inter alia*, FWS to consider Section 10 conservation plans, conservation agreements, and partnerships as reasons to exclude federal lands and areas from critical habitat designations. *Id.*

13. The Habitat Exclusion Rule is contrary to the conservation purpose and mandate of the ESA because, *inter alia*, the new process outlined in the Rule conflates distinct regulatory steps in Section 4(b)(2) by combining the mandatory economic impact analysis for all proposed critical habitat designations with the critical habitat exclusion process, which is discretionary. The Habitat Exclusion Rule also sets out an unlawfully broad list of economic and other relevant impacts that could support habitat exclusion and minimize designation of critical habitat on federal lands. By reducing critical habitat designations, the Rule also may reduce the number, type, and scope of Section 7 consultations and associated alternatives and mitigation measures for proposed federal agency actions, contrary to the fundamental purposes of the ESA, Section 7, and critical habitat designations. *See* 16 U.S.C. §§ 1531(b), (c)(1), 1532(3), (5), 1536(a)(1)–(2).

14. Further, FWS's promulgation of the Habitat Exclusion Rule is arbitrary and capricious because it wholly ignores its 2022 rationale for rescinding the nearly identical 2020 habitat exclusion rule. *See* Endangered and Threatened Wildlife and Plants; Regulations for Designating Critical Habitat, 85 Fed. Reg. 82,376 (Dec. 18, 2020) ("2020 Habitat Exclusion Rule"). In 2022, FWS explained that the 2020 Habitat Exclusion Rule "limits or undermines the Service's role as the expert agency; it constrains the Service's discretion, thus decreasing the agency's ability to further the conservation of endangered and threatened species through designation of their critical habitats; and it does not further the goal of providing clarity and transparency and instead creates confusion." *See* Endangered and Threatened Wildlife and Plants; Regulations for Designating Critical Habitat, 87 Fed. Reg. 43,433, 43,434–35 (July 21, 2022) ("2022 Habitat Exclusion Rescission").

15. FWS has also violated NEPA because both Final Rules are major federal actions that will significantly affect the human environment by eviscerating important protections for ESA-listed species and their habitat. The potential for significant environmental impacts to both protected species and their habitat is self-evident. FWS nevertheless summarily asserts that the Final Rules will have no significant environmental impacts and therefore did not prepare an environmental impact statement ("EIS"), or even an environmental assessment ("EA"). Neither of the Final Rules qualifies for the limited, procedural categorical exclusions from NEPA

compliance upon which FWS summarily relies, and even if they did, extraordinary circumstances would render those exclusions inapplicable.

16. Accordingly, State Plaintiffs seek a declaration that FWS's issuance of the Final Rules violates the ESA, NEPA, and the APA, and request that the Court vacate and set aside the Final Rules.

## JURISDICTION AND VENUE

17. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States) and 28 U.S.C. § 1346 (civil action against the United States). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706. The United States has waived sovereign immunity under 5 U.S.C. § 702.

18. The Final Rules constitute final agency actions under the APA. 5 U.S.C. §§ 704, 706. Many of the State Plaintiffs submitted timely and detailed comments opposing FWS's proposed regulations and have therefore exhausted all administrative remedies with regard to this action. All State Plaintiffs have suffered legal wrong due to FWS's actions and are adversely affected or aggrieved by FWS's actions within the meaning of the United States Constitution and the APA. *Id*. at § 702.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because Plaintiff State of California resides in this judicial district, and in which the California Office of the Attorney General maintains its Oakland and San Francisco offices. This action also seeks relief against federal agencies and officials acting in their official capacities.

## INTRADISTRICT ASSIGNMENT

20. Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of this action to any particular location or division of this Court. This case is related to *California, et al. v. Bernhardt, et al.*, Case No. 4:19-cv-06013-JST (complaint filed Sep. 25, 2019), which challenged FWS's identical rescission of the blanket 4(d) rule in 2019, and *State of California et al. v. Bernhardt et al.*, Case No. 4:21-cv-0440-JST (complaint filed Jan. 19, 2021), which

challenged FWS's nearly identical habitat exclusion rule promulgated in 2020. Both cases were resolved by way of voluntary remand and dismissal and were not adjudicated on the merits. Pursuant to Civil Local Rule 3-12(b), State Plaintiffs intend to promptly file an Administrative Motion to Consider Whether Cases Should Be Related to the earlier-filed actions.

**PARTIES**

21. Plaintiff COMMONWEALTH OF MASSACHUSETTS brings this action by and through Attorney General Andrea Campbell. The Attorney General is the chief legal officer of the Commonwealth and brings this action on behalf of itself and its residents to protect the Commonwealth's sovereign and proprietary interest in the conservation and protection of its natural resources and the environment. *See* Mass. Const. Amend. Art. 97; Mass. Gen. Laws, ch. 12, §§ 3 and 11D.

22. At least twenty-five federally listed endangered or threatened species are known to occur in Massachusetts, including, for example, the threatened piping plover (*Charadrius melodus*) and the northern long-eared bat (*Myotis septentrionalis*), and the endangered shortnose sturgeon (*Acipenser brevirostrum*) and the leatherback sea turtle (*Dermochelys coriacea*). Massachusetts also has enacted and devotes significant resources to implementing numerous laws concerning the conservation, protection, restoration, and enhancement of the Commonwealth's plant, fish, and wildlife resources, such as the Massachusetts Endangered Species Act, which protects over 400 imperiled species, including those listed as endangered, threatened, and special concern species and their habitat. *See* Mass. Gen. Laws, ch. 131A. As such, the Commonwealth has an interest in protecting species in the Commonwealth from harm both within and outside of Massachusetts.

23. Plaintiff STATE OF CALIFORNIA brings this action by and through Attorney General Rob Bonta. The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions in order to protect public rights and interests, including actions to protect the natural resources of the State. Cal. Const. art. V, § 13; Cal. Gov't Code §§ 12600–12612. This challenge is brought in part pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the People of the

State of California's interests in protecting the environment and natural resources of the State of California from pollution, impairment, or destruction. Cal. Const. art. V, § 13; Cal. Gov't Code §§ 12511, 12600–12612; *D'Amico v. Bd. of Med. Exam'rs*, 11 Cal. 3d 1 (1974).

24. The State of California has a sovereign interest in its natural resources and holds all of the State's fish and wildlife and water resources as state property in trust for the benefit of the People of the State of California. *People v. Truckee Lumber Co.*, 116 Cal. 397 (1897); *Nat'l Audubon Soc'y v. Superior Ct.*, 33 Cal. 3d 419 (1983); *Betchart v. Cal. Dep't of Fish & Game*, 158 Cal. App. 3d 1104 (1984); Cal. Water Code § 102; Cal. Fish & Game Code §§ 711.7(a), 1802. In addition, the State of California has enacted numerous laws concerning the conservation, protection, restoration, and enhancement of the fish and wildlife resources of the State, including endangered and threatened species and their habitat. Such laws include, but are not limited to, the California Endangered Species Act, *Id.* at §§ 2050–2089.25, which declares that the conservation, protection, and enhancement of endangered and threatened species and their habitat is a matter of statewide concern, and that it is the policy of the State to conserve, protect, restore, and enhance endangered and threatened species and their habitat. *Id*. at §§ 2050, 2051(c), 2052. As such, the State of California has both a sovereign interest in protecting, and a statutory mandate to protect, species in the State from harm both within and outside of the State and expends significant resources to do so.

25. There are currently 142 fish and wildlife species listed as endangered or threatened under the ESA that reside wholly or partially within the State of California and its waters—more than any other mainland State. Examples include the southern sea otter (*Enhydra lutris nereis*) found along California's central coastline, the desert tortoise (*Gopherus agassizii*) and its critical habitat in the Mojave Desert, the marbled murrelet (*Brachyramphus marmoratus*) in north coast redwood forests, as well as three different runs of Chinook salmon (*Oncorhynchus tshawytscha*) and six different runs of steelhead salmon (*Oncorhynchus mykiss irideus*), and their spawning, rearing, and migration habitat in rivers and streams throughout California. There are also 182 plant species listed as endangered or threatened under the ESA that reside wholly or partially within the State of California, such as the Presidio manzanita (*Arctostaphylos montana ssp.*

*ravenii*), the whitebark pine (*Pinus albicaulis*), the Lassics lupine (*Lupinus constancei*), the large-flowered fiddleneck (*Amsinckia grandiflora*), and the beach layia (*Layia carnosa*). California is also home to millions of acres of critical habitat designated as essential for the conservation of endangered and threatened species.

26. Plaintiff STATE OF MARYLAND is a sovereign state in the United States of America. Maryland is represented by Attorney General, Anthony G. Brown, who is the chief law enforcement officer of the State. The Attorney General has the authority to file suit to challenge action by the federal government in order to protect the natural resources and environment of the State. Md. Const. art. V, § 3(a)(2); Md. Code Ann., State Gov't § 6-106.1.

27. The State of Maryland has enacted laws to protect sensitive species and their habitat and explicitly incorporates federally listed species into state regulations governing imperiled species. Nongame and Endangered Species Act, Md. Code. Nat. Res. §§ 10-2A et seq. Twenty-eight federally listed species, including twenty-one animals and seven plants, are believed to occur in Maryland. A few examples include the federally endangered dwarf wedgemussel (*Prolasmidonta heterodon*), an endangered distinct population segment of the Atlantic sturgeon (*Acipenser oxyrinchus*), the federally threatened bog turtle (*Glyptemys muhlenbergii*), and the federally threatened Puritan tiger beetle (*Ellisoptera puritana*). The state is also home to two species with proposed, but not yet final, threatened status, the green floater mussel (*Lasmigona subviridis*), 88 Fed. Reg. 48,294 (July 26, 2023), and the Bethany beach firefly (*Photuris bethaniensis*), 89 Fed. Reg. 79,857 (Oct. 1, 2024). Additionally, at least one species that occurs in Maryland, the wood turtle (*Glyptemys insculpta*), is subject to a pending petition to list. Many of these species occur not just in Maryland but in other states as well. Maryland therefore has a distinct interest in the recovery of these species not just within its own borders but throughout each species' range.

28. Plaintiff STATE OF WASHINGTON is a sovereign entity and brings this action to protect its own sovereign and proprietary rights. The Attorney General is the chief legal adviser to the State of Washington. The Attorney General's powers and duties include acting in federal court on matters of public concern. This challenge is brought pursuant to the Attorney General's

independent constitutional, statutory, and common law authority to bring suit and obtain relief on behalf of the State of Washington.

29. Wildlife, fish, and shellfish are the property of the State of Washington. Wash. Rev. Code (RCW) § 77.04.012. The Washington Department of Fish and Wildlife actively carries forth the legislative mandate to, *inter alia*, preserve, protect, perpetuate, and manage wildlife, fish, and wildlife and fish habitat. *Id* & § 77.04.055; *see also id*. § 77.110.030 (declaring that "conservation, enhancement, and proper utilization of the state's natural resources … are responsibilities of the state of Washington").

30. The Washington Fish and Wildlife Commission classifies forty-eight species (or sub-species) as Endangered, Threatened, or Sensitive under state law. Wash. Admin. Code 220-610-010; 220-200-100. More than half of these are also federally listed as endangered or threatened under the ESA, including Southern Resident killer whales (*Orcinus orca*), Columbia Basin pygmy rabbits (*Brachylagus idahoensis*), streaked horned larks (*Eremophila alpestris strigata*), and Taylor's checkerspot butterflies (*Euphydryas editha taylori*). In addition, the Washington Department of Fish and Wildlife designates sixty-nine candidates for state listing as endangered, threatened, or sensitive. Several of the state candidates are listed as threatened or endangered under the ESA, including five distinct population segments of steelhead (*Oncorhynchus mykiss*), the short-tailed albatross (*Phoebastria albatrus*), and the wolverine (*Gulo gulo*). In total, sixty-one federally listed entities occur in Washington, including ten evolutionarily significant units of Pacific salmon. Washington is also home to several species or sub-species that FWS is considering for listing under the ESA, including the monarch butterfly (*Danaus plexippus*), the northwestern pond turtle (*Actinemys marmorata*), the Oregon vesper sparrow (*Pooecetes gramineus affinis*), the western bumble bee (*Bombus occidentalis*), and the Cascade torrent salamander (*Rhyacotriton cascadae*).

31. Washington expends significant resources to monitor, protect, and recover state and federally listed species. For example, the Washington Department of Fish and Wildlife expends approximately $1,000,000 annually for management and recovery of the endangered Taylor's

checkerspot butterfly (*Euphydryas editha taylori*) and the Columbia Basin pygmy rabbit (*Brachylagus idahoensis*), both ESA and state listed endangered species.

32. Washington hosts tens of millions of acres of federal lands across ten National Forests, three National Parks, twenty-three National Wildlife refuges, three National Monuments, and numerous Department of Defense lands. These lands include designated critical habitat that plays an important role in the protection and recovery of listed species in Washington.

33. Plaintiff STATE OF ARIZONA brings this action by and through Attorney General Kris Mayes. The Attorney General is the chief legal officer of the State of Arizona and authorized to act in federal court on behalf of the State. Ariz. Rev. Stat. (A.R.S.) § 41-193.

34. As the owner of all wildlife within the State, the State of Arizona has an interest in protecting threatened and endangered species for the benefit of the State and its people. A.R.S. § 17-102. The Federal ESA and the plants and animals it protects are incorporated into Arizona law. A.R.S. § 17-495. The State of Arizona has enacted laws and delegates resources to protect and preserve endangered species and their habitats. This directive is executed through the Arizona State Wildlife Action Plan and the Arizona Department of Game and Fish. A.R.S. §§ 17-268–17-299, 17-314, 17-401–17-495.01.

35. Seventy-five federally listed endangered species are found either wholly or partially within the State of Arizona, including twenty-six plants and forty-nine animals. Several federally endangered large mammals, including the jaguar (*Pantherea onca*), the ocelot (*Leopardus pardalis*), and the Mexican wolf (*Canis lupus baileyi*), can be found in Arizona. Many threatened or endangered birds, fish, amphibians, and reptiles are primarily found within Arizona, such as the Southwestern willow flycatcher (*Empidonax traillii extimus*), the humpback chub (*Gila intermedia*), and the Sonoran tiger salamander (*Ambystoma mavortium stebbinsi*). The State has a distinct interest in preserving Arizona's unique desert ecosystem and the threatened and endangered species living within it.

36. Plaintiff STATE OF COLORADO brings this action by and through Attorney General Phil Weiser, who is the chief legal representative of Colorado. Colo. Rev. Stat. (C.R.S.) § 24-31-101(1)(a).

37. Colorado has a distinct interest in protecting its wildlife. All wildlife in Colorado is the property of the State. C.R.S. § 33-1-101(2). Colorado has enacted laws to protect the State's wildlife for the benefit of the people of Colorado and its visitors. *See* C.R.S. §§ 33-1-101(1)—33-9-206. These laws include specific protections for endangered and threatened species and establish a state policy of assisting in the protection of imperiled species even beyond Colorado's borders. C.R.S. § 33-2-102(1)(b), (c).

38. Colorado is home to more than forty species that are either listed or being reviewed for listing under the ESA. Listed species include the endangered black footed ferret (*Mustela nigripes*), the threatened greenback cutthroat trout (*Oncorhynchus clarkii stomias*), and the threatened Gunnison sage-grouse (*Centrocercus minimus*). Species being reviewed for listing include the lesser prairie-chicken (*Tympanuchus pallidicinctus*), the little brown bat (*Myotis lucifugus*), and the large marble butterfly (*Euchloe ausonides*). Colorado has invested significantly in the conservation of these species. *See, e.g.*, C.R.S. § 24-33-111 (recognizing "the importance of conserving native species that have been listed as threatened or endangered under state or federal law, or are candidate species or are likely to become candidate species as determined by the United States fish and wildlife service," declaring "that the Colorado department of natural resources and the division of parks and wildlife are responsible for the development, implementation, or approval of appropriate programs to address the conservation of such species," and creating a "species conservation trust fund" for this purpose).

39. There are also tens of millions of acres of federal lands in Colorado, including National Parks, National Wildlife Refuges, National Forests, and lands managed by the Bureau of Land Management. These lands provide large swaths of intact habitat for Colorado wildlife and include designated critical habitat for several federally listed species.

40. Plaintiff STATE OF CONNECTICUT brings this action by and through Attorney General William Tong. Attorney General Tong is the constitutional officer of the State with general authority to supervise all legal matters to which the State is a party and has the authority to file civil actions in order to protect public rights and interests, including but not limited to actions to protect the protected natural resources of the State. Conn. Gen. Stat. §§ 3-125; 22a-15.

This challenge is brought in part pursuant to the State's independent statutory authority to represent the people's interests in protecting the environment and natural resources of the State of Connecticut from unreasonable pollution, impairment, or destruction. Conn. Gen. Stat. §§ 22a-5; 22a-16; *Polymer Resources v. Keeney*, 227 Conn. 545, 559, n.22 (1993).

41. The State of Connecticut has a sovereign interest in its natural resources and holds the State's fish and wildlife and water resources in trust for the people of the State for their benefit. *State v. Ball*, 260 Conn. 275, 292 (2002); Conn. Gen. Stat. §§ 22a-5; 22a-15; 26-3. In addition, the State of Connecticut has enacted numerous laws concerning the conservation, protection, restoration, and enhancement of the fish and wildlife resources of the State, including endangered and threatened species, and their habitat. Such laws include, but are not limited to, the Connecticut Endangered Species Act, which declares that the conservation, protection, restoration, and enhancement of endangered and threatened species and their habitat is a matter of statewide concern, and that it is the policy of the State to conserve, protect, restore, and enhance endangered and threatened species and their habitat. Conn. Gen. Stat. §§ 26-303 *et seq*. As such, the State of Connecticut has a sovereign and statutorily mandated interest in protecting species in the State from harm both within and outside of the State.

42. There are currently sixteen fish, plant and wildlife species listed as endangered or threatened under the ESA that reside wholly or partially within the State of Connecticut and its waters. Examples include the piping plover (*Charadrius melodus*), the roseate tern (*Sterna dougallii dougallii*), the dwarf wedgemussel (*Alasmidonta heterodon*), the northern long-eared bat (*Myotis septentrionalis*), the bog turtle, (*Glyptemys muhlenbergii*), and the hawksbill sea turtle (*Eretmochelys imbricata*). Connecticut is also home to several other species undergoing federal status assessment for listing and which are currently listed under the Connecticut Endangered Species Act. Some examples include the wood turtle (*Glyptemys insculpta)*, the diamondback terrapin (*Malaclemys terrapin*), the saltmarsh sparrow (*Ammospiza caudacuta*), and the tricolored bat (*Perimyotis subflavus*). Critical habitats for these species and others exist throughout Connecticut and its waters.

43. Plaintiff STATE OF DELAWARE is a sovereign State of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

44. The Delaware Department of Natural Resources and Environmental Control must protect, manage, and conserve all forms of protected wildlife within Delaware, and to enforce by proper actions and proceedings the law relating thereto. 7 Del. Code § 102(a). The Division of Fish and Wildlife is charged with designating those species of fish and wildlife found to be seriously threatened with extinction. 7 Del. Code §601. Such a list shall in any event include, but not be limited to, endangered species as so designated by the Secretary of the Interior. *See* 7 Del. Admin. Code Part § 3900-16.0.

45. As formally approved by FWS, Delaware's 2025 Wildlife Action Plan[2] provides the State's conservation blueprint for wildlife diversity through 2035, including prioritizing the protection of endangered species, designating those and others as Delaware's species of greatest conservation need. The Delaware Department of Natural Resources and Environmental Control's conservation partners worked with wildlife experts, scientists, other key stakeholders and the public throughout the State and region gathering input to develop and revise the plan to protect wildlife diversity now and prepare to adapt to future dynamic wildlife populations, habitats, threats, and actions.

46. There are twenty-six different animals found in Delaware that are considered federally endangered under the ESA, including eight species that are infrequent visitors. There are also several federally endangered plants that grow in Delaware, like the swamp pink (*Helonias bullata*). However, Delaware's Wildlife Action Plan lists many more species. Delaware's species of greatest conservation need include three carnivorous mammals (such as the bobcat, or *Lynx rufus*), four small mammals (including the Delmarva fox squirrel or *Sciurus niger cinereus*), five

[2] DEL. DEP'T OF NAT. RES. & ENV'T CONTROL, THE 2025-2035 DELAWARE WILDLIFE ACTION PLAN (last visited July 7, 2026), https://dnrec.delaware.gov/dewap/.

cave bats, four tree bats, seven marine mammals (including the federally listed North Atlantic right whale or *Eubalaena glacialis*), and twenty endangered breeding birds (such as the federally listed red knot or *Calidris canutus*). Delaware's state-designated endangered species include ten mammals, eight reptiles (such as the federally listed loggerhead sea turtle or *Caretta caretta*), four amphibians (such as the barking treefrog or *Hyla gratiosa*), seven fish (such as the federally listed Atlantic sturgeon or *Acipenser oxyrhynchus*), seven mollusks (such as the tidewater mucket or *Leptodea ochracea*), and thirty-one insects (such as the Bethany Beach firefly or *Photuris bethaniensis*).

47. Plaintiff STATE OF HAWAI'I, represented by and through its Attorney General Anne E. Lopez, is a sovereign state of the United States of America. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues § 28-1 to pursue this action.

48. The State of Hawai'i has a sovereign interest in its natural resources and holds all of the State's public natural resources in trust for the benefit of the people of the State of Hawai'i. Haw. Const. Art. XI, § 1. The State of Hawai'i has enacted laws concerning the conservation, protection, restoration, and enhancement of the fish and wildlife resources of Hawai'i, including threatened and endangered species and their habitat. Such laws include the Hawai'i endangered species laws, which state that since the settlement of the Hawaiian islands, "many species of aquatic life, wildlife, and land plants that occurred naturally only in Hawaii have become extinct and many are threatened with extinction, primarily because of increased human use of the land and disturbance to native ecosystems," and that the State of Hawai'i's policy is to "take positive actions to enhance their prospects for survival." Haw. Rev. Stat. § 195D-1. The Hawai'i Constitution directs that the that the State of Hawai'i "shall conserve and protect Hawaii's natural beauty and all natural resources," including but not limited to the "marine, seabed and other resources located within the boundaries of the State, including the archipelagic waters of the State." Haw. Const. Art. XI, §§ 1, 6. As such, the State of Hawai'i has an interest in protecting species in the State from harm.

49. There are currently about 500 wildlife and plant species listed as endangered or threatened under the ESA that reside wholly or partially within the State of Hawai‘i and its waters. Examples include the Hawaiian monk seal (*Neomonachus schauninslandi*), the Insular False Killer Whale Distinct Population Segment (*Pseudorca crassidens*), honeycreeper birds (e.g., *Drepanis coccinea*, *Oreomystis bairdi*), sea turtles (*Chelonia mydas, Eretmochelys imbricata, Lepidochelys olivacea*), and coral (*Acropora globiceps, A. retusa, A. speciosa, Fimbriaphyllia paradivisia, Isopora crateriformis*). Hawai‘i, including the northwestern Hawaiian islands, contains hundreds of thousands of acres that are essential for the conservation and recovery of endangered and threatened species existing nowhere else in the world.

50. Plaintiff STATE OF ILLINOIS brings this action by and through Attorney General Kwame Raoul. The Attorney General is the chief legal officer of the State of Illinois, Ill. Const. Art V, § 15, and "has the prerogative of conducting legal affairs for the State." *Env't Prot. Agency v. Poll. Control Bd*., 372 N.E.2d 50, 51 (1977). He has common law authority to represent the People of the State of Illinois and "an obligation to represent the interests of the People so as to ensure a healthful environment for all the citizens of the State." *People v. NL Indus*., 604 N.E.2d 349, 358 (1992).

51. The State of Illinois has "ownership of and title to all wild birds and wild mammals," 520 Ill. Comp. Stat. (CS) 5/2.1, and "all aquatic life" within the State, 515 Ill. CS 5/5-5. *See United Taxidermists Ass'n v. Ill. Dep't of Nat. Res*., 436 Fed. Appx. 692, 695 (7th Cir. 2011). Through the Illinois Department of Natural Resources ("IDNR"), the State of Illinois protects wild birds, wild mammals, fish, aquatic life, reptiles, amphibians, and invertebrates found in Illinois pursuant to the Wildlife Code, 520 Ill. CS 5/2.1, the Fish and Aquatic Life Code, 515 Ill. CS 5/5-5, and the Herptiles-Herps Act, 510 ILCS 68/105-80. The State of Illinois has also enacted numerous laws to protect endangered species (*e.g.*, 520 ILCS 10), animal habitat (*e.g.*, 520 ILCS 20), and the State's natural areas and caves (*e.g.*, 525 ILCS 33, 525 ILCS 5/6). Accordingly, the State has a substantial interest in protecting wildlife and endangered and threatened species both within and outside its borders.

52. Under the Illinois Endangered Species Protection Act, there are 175 endangered or threatened species living in Illinois. *See* Ill. Adm. Code tit. 17, pt. 1010. Included in the 175 endangered or threatened species in Illinois are twenty-four species also listed as federally endangered or threatened under the ESA. This includes the pallid sturgeon (*Scaphirhynchus albus*), the piping plover (*Charadrius melodus*), the rufa red knot (*Calidris canutus rufa*), the gray bat (*Myotis grisescens*), and the Indiana bat (*Myotis sodalist*). All of these species are known to migrate into, out of, or through Illinois. Illinois spends, on average, $3.5 million annually from State and federal funds for the protection of endangered and threatened species, including species that migrate into, out of, or through Illinois from or into other jurisdictions.

53. Prior to IDNR receiving federal assistance via grants awarded by the Service (e.g., State Wildlife Grants, Pittman Robertson, Dingell Johnson, ESA Section 6 Grants), IDNR must first formally consult with the Service under Section 7(a)(2) using the best scientific and commercial data available. The 4(d) Rule now requires species-specific rules tailored to every threatened species, which will make the Section 7 consultation process more complex, time consuming, and laborious because widespread application of general avoidance and minimization measures is no longer a feasible option. This will in turn require more IDNR staff capacity to complete these reviews and may cause project delays or deferred grant awards that will impact land acquisition, hunting and fishing opportunities, construction of infrastructure, and conservation of plants and animals.

54. Plaintiff STATE OF MICHIGAN is a sovereign state in the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan. The Michigan Attorney General is authorized to "appear for the people of [the] state in any . . . court or tribunal, in any cause of matter . . . in which the people of [the] state may be a party or interested." Mich. Comp. Laws § 14.28. The People declared when they enacted Michigan's Constitution that the "conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people." Mich. Const. art. 4, § 52. Accordingly, they tasked

Michigan's Legislature with "the protection of . . . [the] natural resources of the state from . . . impairment and destruction." *Id.*

55. Michigan's Legislature responded by passing the Natural Resources and Environmental Protection Act. Mich. Comp. Laws § 324.101 *et seq.* That law declares that "[a]ll animals found in this state, whether resident or migratory and whether native or introduced, are the property of the people of the state." *Id.* § 324.40105; *see also id.* § 324.48702(1) ("all fish, reptiles, amphibians, mollusks, and crustaceans found in this state are the property of the state."). Part 365 of that law, titled Endangered Species Protection, requires Michigan to "perform those acts necessary for the conservation, protection, restoration, and propagation of endangered and threatened species of fish, wildlife, and plants in cooperation with the federal government, pursuant to the Endangered Species Act of 1973, Public Law 93-205, 87 Stat. 884, and with rules promulgated by the Secretary of the Interior under that act." *Id.* § 324.36502.

56. Michigan has twenty-six plants and animals the Services have listed as threatened or endangered. These include the Eastern massasauga rattlesnake in Michigan's marsh areas (*Sistrurus catenatus*), the piping plover on the shores of the Great Lakes (*Charadrius melodus*), and the iconic Michigan monkey-flower (*Mimulus michiganensis*). Recovering these and other threatened or endangered species is key to protecting the People's interest in conserving and developing Michigan's natural resources.

57. Plaintiff STATE OF MINNESOTA is a sovereign state in the United States of America. Attorney General Keith Ellison brings this action on behalf of Minnesota to protect the interests of Minnesota and its residents. The Attorney General's powers and duties include acting in federal court in matters of state concern. Minn. Stat. § 8.01.

58. The responsibility of the State of Minnesota includes use of all practicable means to "preserve important existing natural habitats of rare and endangered species of plants, wildlife, and fish, and provide for the wise use of our remaining areas of natural habitation, including necessary protective measures where appropriate." Minn Stat. §116D.02, subd. 2(10). Ownership of wild animals in Minnesota "is in the state, in its sovereign capacity for the benefit of all people of the state." Minn. Stat. § 97A.025; *see also* Minn. Stat. § 97A.501, subd. 1. In fulfillment of this

wildlife trust obligation, Minnesota has determined that its fish and wildlife are "to be conserved and enhanced through [the State's] planned scientific management, protection, and utilization." Minn. Stat. § 84.941. Minnesota's Endangered Species Statute provides for Minnesota to designate and protect endangered species, threatened species, or species of special concern. Minn. Stat. § 84.0895. No person may take, import, transport, or sell an endangered or threatened species of wild animal or plant unless authorized by Minnesota's Endangered Species Statute. Minn. Stat. § 84.0895, subd. 1. Minnesota regulates the treatment of species that it has designated as endangered and threatened. Minn. R. 6212.1800-2300. Minnesota's definitions of endangered and threatened species differ from—but overlap with—federal definitions under the Federal Endangered Species Act, which also serves to identify, regulate, and protect the wildlife in the State.

59. Minnesota designates species of animals and plants as endangered, threatened, or species of special concern under Minnesota Rules, Chapter 6134. In total, eighteen federally listed endangered or threatened species are believed to occur in Minnesota. Seventeen of these species also occur in other states, including the endangered northern long-eared bat (*Myotis septentrionalis*) and the winged mapleleaf mussel (*Quadrula fragosa*), and the threatened Dakota skipper (*Hesperia dacotae*). One federally endangered species, the Minnesota dwarf trout lily (*Erythronium propullans*), occurs only within Minnesota. At least two federally listed species, the Karner blue butterfly (*Plebejus samuelis)* and the Poweshiek skipperling (*Oarisma Poweshiek*), are now believed extirpated from Minnesota but still occur in neighboring states.

60. In partnership with federal agencies, Minnesota has invested in, and implemented, programs and permitting to assist in protecting and recovering these and other listed species. Minnesota therefore has an interest in the recovery of these species in Minnesota. In addition, many of the species defined under Minnesota or federal regulations occur in other states and the management of those species in other states affects their ongoing viability in Minnesota. Minnesota therefore has an interest in the recovery of such species throughout their range.

61. Plaintiff STATE OF NEW JERSEY is a sovereign state of the United States of America. Attorney General Jennifer Davenport is the State's chief law enforcement officer and is

authorized to bring this action on behalf of New Jersey to protect the interests of the State and its residents and citizens. New Jersey holds wildlife in trust for the benefit of all of its people. The New Jersey Legislature has declared that it is the policy of the State to manage all forms of wildlife to ensure their continued participation in the ecosystem. N.J. Stat. Ann. § 23:2A-2.

62. At least twenty-two federally listed endangered or threatened species are known to occur in New Jersey, including, for example, the threatened piping plover (*Charadrius melodus*), the red knot (*Calidris canutus rufa*), and the northern long-eared bat (*Myotis septentrionalis*), and the endangered Indiana bat (*Myotis sodalist*) and the dwarf wedgemussel (*Alasmidonta heterodon*). In 2018, New Jersey designated the threatened bog turtle (*Clemmys muhlenbergii*) as the official state reptile. New Jersey protects, conserves, restores, and enhances plants, fish, and wildlife resources within the State through direct protective legislation such as the Endangered and Non-Game Species Conservation Act ("ENSCA"), N.J. Stat. Ann. §§ 23:2A-1 to -16, and the Endangered Plant Species List Act, *id.* §§ 13:1B-15.151 to -158. New Jersey also considers federal and state-listed species through other legislation including, but not limited to, the Freshwater Wetlands Protection Act, *id*. § 13:9B-7(a)(2) and the Highlands Water Protection and Planning Act, *id*. § 13:20-34(a)(4), and regulatory provisions such as the Pinelands Comprehensive Management Plan, N.J. Admin. Code §§ 7:50-6.27 and 6.33 (adopted, in part, pursuant to 16 U.S.C. § 471i(f)(1)(A)) and the Coastal Zone Management Rules, N.J. Admin. Code § 7:7-9.36.

63. New Jersey also expends significant resources purchasing and maintaining key habitats relied upon by listed species, including vital foraging and nesting habitats along the State's coastal Barrier Islands and the Cape May Peninsula. For example, New Jersey invests time, resources, and funding to manage the federally listed threatened red knot. Twice annually, red knots migrate between South America and the Arctic. New Jersey and Delaware are critically important stops during the red knot's northern migration to feed on horseshoe crab eggs where the red knots must eat enough to continue their arduous journey to the Arctic. New Jersey has an interest in protecting species inhabiting this State from harm both inside and outside of its

borders, and New Jersey depends on its federal partners and other states to equally protect the red knot when it is not in New Jersey.

64. Plaintiff STATE OF NEW MEXICO brings this action by and through Attorney General Raúl Torrez. The Attorney General of New Mexico is authorized to prosecute in any court or tribunal all actions and proceedings, civil or criminal, when, in his judgment, the interest of the State requires such action. N.M. Stat. Ann. (N.M.S.A), § 8-5-2. Under the Constitution of New Mexico, "protection of the state's beautiful and healthful environment is . . . declared to be of fundamental importance to the public interest, health, safety and the general welfare." N.M. Const. art. XX, § 21. This provision "recognizes that a public trust duty exists for the protection of New Mexico's natural resources . . . for the benefit of the people of this state." *Sanders-Reed ex rel. Sanders-Reed v. Martinez*, 350 P.3d 1221, 1225 (N.M. Ct. App. 2015). The New Mexico Game and Fish Department is entrusted with the maintenance of wildlife and wildlife habitat and related consultations with federal and other agencies toward that goal, N.M.S.A., § 17-1-5.1, and oversees a program for conserving endangered plant species, *id.* § 75-6-1; *see also* N.M. Code R.19.33.2.1–19.33.6.10 (rules pertaining to state endangered and threatened species).

65. FWS lists forty-five animal and eighteen plant species as threatened or endangered in New Mexico. These include the endangered, iconic Southwestern willow flycatcher (*Empidonax traillii extimus*), the endangered Rio Grande silvery minnow (*Hybognathus amarus*), the endangered jaguar (*Panthera onca*), the endangered Mexican wolf (*Canis lupus baileyi*), and the threatened Mexican spotted owl (*Strix occidentalis lucida*). Protecting rare species and their habitats is fundamental to protecting New Mexico's wildlife and wild places. Tourism, often focused on outdoor recreational activities, is an important driver of New Mexico's economy. In 2024, tourism accounted for $8.8 billion in direct spending and created roughly 95,000 jobs. In 2024, outdoor recreation alone generated $3.6 billion in economic activity and supported approximately 31,000 jobs. Among the most-visited places in the State is the Bosque del Apache National Wildlife Refuge, established in 1939 to provide a critical stopover for migrating waterfowl and recognized as one of the premier bird-watching areas in North America. New Mexico hosts eight additional National Wildlife Refuges, fifteen National Parks, and numerous

National Monuments, National Conservation areas, and Department of Defense lands. New Mexico's five national forests—the Carson, Cibola, Gila, Lincoln, and Santa Fe National Forests—encompass 9.4 million acres, including most of the State's mountainous areas plus isolated sections of the State's eastern prairies. Overall, 24,665,774 acres in New Mexico are federally owned, accounting for nearly thirty-two percent of the State's land mass.

66. Plaintiff STATE OF NEW YORK brings this action by and through Attorney General Letitia James. The Attorney General is the chief legal officer of the State of New York and brings this action on behalf of the State and its citizens and residents to protect their interests, and in furtherance of the State's sovereign and proprietary interests in the conservation and protection of the State's natural resources and the environment. The State of New York has an ownership interest in all non-privately held fish and wildlife in the State, and has exercised its police powers to enact laws for the protection of endangered and threatened species, protections long recognized to be vitally important and in the public interest. *See* N.Y. Envtl. Conserv. Law §§ 11-0105, 11-0535; *Barrett v. State*, 220 N.Y. 423 (1917). Wildlife conservation is a declared policy of the State of New York. *See* N.Y. Const. art. XIV, § 3.

67. There are dozens of federally endangered or threatened species that reside in whole or in part within the State of New York and its waters. Many of these species are highly migratory, and their recovery requires conservation efforts in New York, up and down the Atlantic Seaboard, and beyond. Examples include four species of sea turtles that can be found in New York waters—the loggerhead (*Caretta caretta*), the green (*Chelonia mydas*), the leatherback (*Dermochelys coriacea*) and the Kemp's Ridley (*Lepidochelys kempii*). Achieving effective recovery for each of these species requires strong ESA enforcement to protect such individuals that feed around Long Island, as well as those breeding and nesting in the southern United States.

68. Robust species protections under the ESA are very important to New York. New York hosts ten National Wildlife Refuges, home to federally protected species like the piping plover (*Charadrius melodus*), and dozens of other federal sites, which along with numerous in-State activities that require federal licensing and/or permitting and are subject to ESA Section 7 consultation requirements. Full and adequate implementation of the ESA's species-listing and

habitat-designation provisions is critical for species' survival within New York and elsewhere. To date, faithful implementation of the ESA by the federal government, coordinated together with state efforts, have helped species recover from the brink of extinction. Habitat protection efforts led by NMFS and New York have greatly increased populations of the endangered shortnose sturgeon (*Acipenser brevirostrum*) and the Atlantic sturgeon (*Acipenser oxyrinchus*). The northern long-eared bat (*Myotis septentrionalis*) also resides in-state and benefits from federal-state coordination. And one of the greatest endangered species success stories, the recovery and delisting of the iconic bald eagle (*Haliaeetus leucocephalus*), is due to federal and state efforts including FWS critical habitat protections under the ESA, and New York's reintroduction of this virtually extirpated species by importing young birds and hand-rearing them before release. Thus, strong ESA protections both within its state borders and throughout each species' range are fundamental to New York's interests.

69. Plaintiff STATE OF OREGON brings this suit by and through Attorney General Dan Rayfield. The Oregon Attorney General is the chief legal officer of the State of Oregon. The Attorney General's duties include acting in federal court on matters of public concern and upon request by any state officer when, in the discretion of the Attorney General, the action may be necessary or advisable to protect the interests of the State. Ore. Rev. Stat. § 180.060(1). The Oregon Department of Fish and Wildlife, established as a state agency by the Oregon Legislature pursuant to Ore. Rev. Stat. § 496.080, has requested that the Attorney General bring this suit to protect Oregon's sovereign interest in preserving threatened and endangered species.

70. The State of Oregon has a sovereign interest in its natural resources and is the sovereign owner of the State's fish and wildlife. Under Oregon law, "[w]ildlife is the property of the State." Ore. Rev. Stat. § 498.002. The State of Oregon has enacted numerous laws and rules concerning the conservation and protection of the fish and wildlife resources of the State, including endangered and threatened species and their habitat. *See, e.g.*, Oregon Endangered Species Act, Ore. Rev. Stat. §§ 496.171–496.192, 498.026; Fish and Wildlife Habitat Mitigation Policy, Or. Admin. R. 635-415-0000 (creating goals and standards to "mitigate impacts to fish and wildlife habitat caused by land and water development actions"); and Goal 5 of Oregon's

statewide land use planning goals, Or. Admin. R. 660-015-0000(5) ("[l]ocal governments shall adopt programs that will protect natural resources," including wildlife habitat). The State of Oregon has an interest in protecting species in the State from harm both within and outside of the State.

71. Oregon is home to numerous fish, land animals, and plants that the Services have listed as endangered or threatened species. There are twenty-seven wildlife and seventeen plant species listed as threatened or endangered that occur in Oregon. Of most significance in this case is that the fate of many of these species is directly a result of, and tied to, federal projects (e.g., dams) or federal land management that is subject to Section 7 consultation. For example, many of the State's iconic salmon and steelhead runs have been listed because of sharp population declines. This includes the majority of salmon and steelhead runs in the Columbia River basin where the construction of federal dams was a primary factor in their decline and where ongoing hydropower operations continue to hinder their recovery.

72. Elsewhere in the State, there are listed species—such as the marbled murrelet (*Brachyramphus marmoratus*), the western snowy plover (*Anarhynchus nivosus nivosus*), the bull trout (*Salvelinus confluentus*), the Hutton tui chub (*Gila bicolor*), the Lost River sucker (*Deltistes luxatus),* the northwestern pond turtle (proposed, *Actinemys marmorata),* the coastal marten (*Martes caurina*), the Oregon spotted frog (*Rana pretiosa)*, and the northern spotted owl (*Strix occidentalis caurina)*—that depend on the tens of millions of acres of federal public lands, including twelve National Forests, eighteen National Wildlife Refuges, Crater Lake National Park, and over fifteen million acres of Bureau of Land Management lands.

73. The rescission of the 4(d) Rule reduces the efficacy and efficiency of ESA protections achieving recovery of listed species, increases economic costs, and results in poorer outcomes for newly listed species. If species-specific 4(d) regulations are not adopted at the time of listing Oregon species, newly threatened species will receive no greater protection than they had before listing. For example, very few threatened plants currently have species-specific rules in place. If no 4(d) rule is in place, the development of habitat conservation plans and issuance of incidental

take permits will be delayed—having an immediate impact on the pace at which Oregon can engage in recovery planning.

74. Plaintiff STATE OF RHODE ISLAND brings this action by and through Attorney General Peter F. Neronha. The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions in order to protect public rights and interests, including actions to protect the natural resources of the State. R.I. Const. art. I, § 17; R.I. Gen. Laws R.I. §§ 10-20-1, *et seq*. This challenge is brought in part pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the people's interests in protecting the environment and natural resources of the State of Rhode Island from pollution, impairment, or destruction. *Id.*; *Newport Realty, Inc. v. Lynch*, 878 A.2d 1021 (R.I. 2005).

75. The State of Rhode Island has a sovereign interest in its natural resources and is the sovereign and proprietary owner of all the State's fish and wildlife and water resources, which are state property held in trust by the State for the benefit of the people of the State. RI. Const. Art. I § 17. In addition, the State of Rhode Island has enacted numerous laws concerning the conservation, protection, restoration, and enhancement of the fish and wildlife resources of the State, including endangered and threatened species, and their habitat. As such, the State of Rhode Island has an interest in protecting species in the State from actions both within and outside of the State.

76. There are currently eleven species listed as endangered or threatened under the ESA that reside wholly or partially within the State of Rhode Island and its waters. Examples include the roseate tern (*Sterna dougallii*) and piping plover (*Charadrius melodus*), found along Rhode Island's coastal beaches and islands; the sandplain gerardia (*Agalinis acuta*), which inhabits dry, sandy, poor-nutrient soils in sandplain and serpentine sites; and the American burying beetle (*Nicrophorus americanus*), which once lived in thirty-five states, the District of Columbia, and three Canadian provinces, but now are known to occur in only six states. Rhode Island has thousands of acres of federal public lands, numerous Federal Wildlife Refuges, multiple federal water projects, numerous military facilities and other federal facilities and infrastructure projects that are subject to the ESA's requirements. Moreover, countless acres of non-federal lands and

numerous non-federal facilities and activities in Rhode Island are subject to federal permitting and licensing requirements.

77. Plaintiff STATE OF VERMONT brings this action by and through Attorney General Charity R. Clark. The Attorney General appears for the State in civil causes and has the general supervision of matters and actions in favor of the State. Vt. Stat. Ann. (V.S.A.) tit. 3, §§ 157, 159. The State brings this action in its capacity as sovereign, as trustee of the State's natural resources and owner of property, and pursuant to its *parens patriae* authority on behalf of the Vermont public, to conserve and protect Vermont's natural resources and environment. *See, e.g.*, Vt. Const. ch. II, § 67 (establishing that the fish and wildlife of the State are held in trust by the State for the benefit of the inhabitants of Vermont); *State v. Malmquist*, 114 Vt. 96, 102, 40 A.2d 534, 538 (1994) (describing public trust authority in protecting fish); *State v. Theriault*, 70 Vt. 617, 41 A. 1030, 1032 (1898) (describing public trust in wildlife).

78. At least ten federally listed endangered or threatened species are known to occur in Vermont, including, for example, the endangered shortnose sturgeon (*Acipenser brevirostrum*), the northern long-eared bat (*Myotis septentrionalis*), and the wolf (*Canis lupus*), and the threatened Canadian lynx (*Lynx canadensis*), the wolverine (*Gulo gulo*), and the Puritan tiger beetle (*Ellipsoptera puritana*). Vermont also has enacted and devotes significant resources to implementing numerous laws concerning the conservation, protection, restoration, recovery, and enhancement of the State's plant, fish, and wildlife resources, including the Vermont Endangered Species Law, V.S.A. tit. 10, §§ 5401–5410, which protects approximately 220 imperiled plant and animal species, including those listed as federally endangered or threatened. Several of these species occur not just in Vermont, but in other States. Vermont therefore has a distinct interest in the recovery of these species not just within its own borders but throughout each species' range.

79. Plaintiff COMMONWEALTH OF VIRGINIA is a sovereign state of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code Ann. (Va. Code) § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

80. At least eighty-one federally-listed endangered or threatened species (fish, wildlife, and plants) and nine species proposed for federal listing are known to occur in the Commonwealth of Virginia. Examples include the eastern black rail (*Laterallus jamaicensis jamaicensis*, federally designated as threatened), the piping plover (*Charadrius melodus*, federally designated as threatened), the red-cockaded woodpecker (*Picoides borealis*, federally designated as threatened), the northern long-eared bat (*Myotis septentrionalis*, federally designated as endangered), and the *Appalachian rockshell* (*Theliderma sparsa*, a highly-imperiled species of freshwater mussel federally designated as endangered). Critical habitat has been designated under the authorities of the Federal Endangered Species Act for many listed aquatic species known from the Upper Tennessee River basin in southwest Virginia, the Big Sandy basin in southwest Virginia, and in other areas of the state.

81. The Commonwealth of Virginia has enacted numerous laws to protect fish and wildlife generally and federally designated and state-designated endangered and threatened species specifically. The state Endangered Species Act (Va. Code § 29.1-563 *et seq.*) and the Virginia Endangered Plant and Insect Species Act (Va. Code § 3.2-1000 *et seq.*), as well as respective derivative regulations, protect federal and state listed animals and plants. In the context of listed fish and wildlife, state regulation related to "take" of federal or state threatened and endangered species further precludes "harm" to animals where an action may include significant habitat modification or degradation where the action actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering. *See* 4 Va. Admin. Code § 15-20-140.

82. Under Section 6 of the Federal ESA, the Virginia Department of Wildlife Resources is a signatory to a Cooperative Agreement with FWS and a Limited Cooperative Agreement with NMFS regarding shared interest in the conservation and recovery of federally listed species. The Virginia Department of Wildlife Resources makes significant investments annually in related conservation and recovery activities, particularly within Virginia. Actions also occur across state boundaries for the regional or range-wide recovery of species with distributions that extend beyond Virginia. For example, the Commonwealth has propagated in captivity two species of

federally endangered freshwater mussels—the oyster mussel (*Epioblasma capsaeformis*) and the Tennessee bean (*Venustaconcha trabalis*)—that have been donated to support recovery efforts of those species in waters in Alabama and Tennessee.

83. Plaintiff STATE OF WISCONSIN is a sovereign state of the United States of America and brings this action by and through its Attorney General, Joshua L. Kaul, who is the chief legal officer of the State of Wisconsin and has the authority to file civil actions to protect Wisconsin's rights and interests. *See* Wis. Stat. § 165.25(1m). The Attorney General's powers and duties include appearing for and representing the State, on the governor's request, "in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested." *Id*.

84. In filing this action, the Attorney General seeks to prevent injuries to the State and its residents relating to their substantial interests in protecting and preserving threatened and endangered animals and plants. These injuries include harms to Wisconsin's sovereign, quasi-sovereign, and proprietary interests.

85. Wisconsin holds legal title to all wild animals in the State "for the purposes of regulating [their] enjoyment, use, disposition, and conservation." Wis. Stat. § 29.011(1). In 1972, Wisconsin became one of the first states to enact its own state-level endangered species law. *See generally id*. § 29.604. In doing so, the Wisconsin Legislature found that "the activities of both individual persons and governmental agencies are tending to destroy the few remaining whole plant–animal communities in this state," and that the preservation of those communities "is of highest importance." *Id*. § 29.604(1). The Legislature recognized "that certain wild animals and wild plants are endangered or threatened," and that those species "are entitled to preservation and protection as a matter of general state concern." *Id*. § 29.604(1). The State of Wisconsin therefore has substantial sovereign and statutory interests in protecting species in the State from harms within and from outside of the State.

86. The Federal ESA has been important for species recovery efforts in Wisconsin. The State, through its Department of Natural Resources, works on numerous projects to maintain and restore its federally endangered and threatened species. Wisconsin designates 233 species of

animals and plants as endangered or threatened within the State. Fifteen of these species are also federally endangered or threatened. Many of these species also occur in other States, including the northern long-eared bat (*Myotis septentrionalis*) (threatened federally and endangered in Wisconsin) and the winged mapleleaf mussel (*Quadrula fragosa*) (threatened federally and endangered in Wisconsin).

87. Plaintiff DISTRICT OF COLUMBIA is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code § 1-301.81.

88. The District government, through its Department of Energy and the Environment ("DOEE"), "[s]erve[s] as the trustee for natural resources for the District." D.C. Code § 8-151.08(8). DOEE has a statutory mandate "to protect human health and the environment," D.C. Code § 8-151.02, and is authorized "to set policy, regulate activities, and implement programs and initiatives to protect, restore, and enhance natural resources and the environment," including "[a]dministering habitat, aquatic resources, and wildlife conservation and restoration programs." D.C. Code §§ 8-151.06(2), (2)(E). DOEE also creates, manages, and executes the District's State Wildlife Action Plan ("SWAP"). The District's SWAP provides the framework for conserving the District's wildlife and their habitats. Accordingly, the District has an interest in protecting species in the District, particularly threatened and endangered species. The ESA is incorporated into District environmental regulations by reference. D.C. Mun. Regs. tit. 10-A, § 609.5; D.C. Mun. Regs. tit. 21, §§ 2600.6(c), 2699.1. As the District does not have a state-equivalent of the ESA, federal partnership is essential to the protection of local wildlife, particularly on federal lands. Federal protections also protect species in the District from harm caused by actions in neighboring states.

89. The District is home to four federally listed endangered species: the Atlantic sturgeon (*Acipenser oxyrinchus*), the shortnose sturgeon (*Acipenser brevirostrum*), the northern long-eared bat (*Myotis septentrionalis*), and the Hay's Spring amphipod (*Stygobromus hayi*), a small freshwater crustacean. The Hay's Spring amphipod is endemic to the District and is found in 2.5 miles of the Lower Rock Creek Watershed, including in areas which are owned and managed by the U.S. National Park Service and the Smithsonian Institution. Additionally, the tricolored bat (*Perimyotis subflavus*) and monarch butterfly (*Danaus plexippus*) are proposed for listing as endangered species.

90. Defendant UNITED STATES FISH AND WILDLIFE SERVICE is an agency within the United States Department of the Interior, 16 U.S.C. § 742b, to which the Secretary of the Interior has delegated authority to administer the ESA with regard to endangered and threatened terrestrial and freshwater plant and animal species and certain marine species, and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

91. Defendant BRIAN NESVIK is the Director of FWS and is responsible for implementing and enforcing the ESA with respect to terrestrial and freshwater fish, wildlife and plant species and certain marine mammal species. Mr. Nesvik establishes FWS policies, sets priorities, issues directives, and is responsible for all FWS does or fails to do. Mr. Nesvik is sued in his official capacity.

92. Defendant DOUG BURGUM is the Secretary of the United States Department of the Interior, that agency's highest-ranking official, and is sued in his official capacity. Mr. Burgum has responsibility for implementing and fulfilling the duties of the United States Department of the Interior, including the administration of the ESA with regard to endangered and threatened terrestrial and freshwater animal and plant species and certain marine species, and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

93. Defendant KEVIN LILLY is the Principal Deputy for Fish and Wildlife and Parks and is sued in his official capacity. Mr. Lilly signed both the 4(d) Rule and the Habitat Exclusion Rule while exercising the delegated authority of the Assistant Secretary for Fish and Wildlife and Parks, Department of the Interior.

## STATUTORY BACKGROUND

### I. ENDANGERED SPECIES ACT

94. Congress enacted the ESA nearly fifty-five years ago in a bipartisan effort "to halt and reverse the trend toward species extinction, whatever the cost." *TVA v. Hill*, 437 U.S. at 184; *see* 16 U.S.C. § 1531(a).

95. The fundamental purposes of the ESA are to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species[.]" 16 U.S.C. § 1531(b). Further, the ESA declares "the policy of Congress that *all Federal departments and agencies shall* seek to conserve endangered … and threatened species and shall utilize their authorities in furtherance of the purposes of [the ESA]." *Id.* § 1531(c)(1) (emphasis added); *see also id.* § 1536(a)(1). As mentioned above, the ESA defines "conserve" broadly to mean full recovery of listed species to the point at which they no longer need the ESA's protections. *Id.* § 1532(3).

96. The Department of the Interior has authority to administer the ESA with regard to threatened and endangered terrestrial flora and fauna, as well as freshwater fish, while the Department of Commerce has authority to administer the ESA with regard to most endangered and threatened marine and anadromous fish species. The Secretary of the Interior has delegated authority to administer the ESA to FWS and the Secretary of Commerce has delegated authority to administer the ESA to the National Marine Fisheries Service ("NMFS") (collectively, the "Services").

97. The Services implement the ESA's statutory purposes through multiple vital statutory mechanisms. Section 4 of the ESA, 16 U.S.C. § 1533, prescribes the process for the Services to list a species as "endangered" or "threatened" within the meaning of the statute and to designate "critical habitat" for each listed species. 16 U.S.C. §§ 1533(a)(1), (a)(3)(A)(i), (b)(6)(C). The ESA defines an endangered species as one "in danger of extinction throughout all or a significant portion of its range," while a threatened species is "likely to become an endangered species

within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(6), (20).

98. When the Services list a species as endangered or threatened, they generally also must designate, "to the maximum extent prudent and determinable," specified "critical habitat" for that species concurrent with its listing. *Id.* §§ 1532(5), 1533(a)(3)(A). The ESA defines critical habitat as "(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the [ESA], on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and (ii) specific areas outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such areas are essential for the conservation of the species." *Id*. § 1532(5)(A). Critical habitat must be sufficient for the conservation (i.e., recovery) of the species for which the critical habitat is designated. *See Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004) (noting the "purpose of establishing 'critical habitat' is for the government to carve out territory that is not only necessary for the species' survival but also essential for the species' recovery").

99. The ESA provides that the Services "shall designate critical habitat … on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." *Id*. § 1533(b)(2). Section 4(b)(2) further provides that "[t]he Secretary *may* exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned." *Id*. (emphasis added).

100. Section 7 of the ESA, 16 U.S.C. § 1536, requires all federal agencies, including the Services, to "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of" endangered and threatened species. *Id*. § 1536(a)(1). Section 7 also requires all federal agencies to "insure" that any action they propose to authorize, fund, or carry out "is not likely to jeopardize the continued existence" of any endangered or threatened

species or, as particularly relevant here, "result in the destruction or adverse modification of" any designated critical habitat. *Id.* § 1536(a)(2).

101. If a federal agency proposes to authorize, fund, or carry out an action that "may affect" a listed species or designated critical habitat, the federal agency must initiate consultation with the Services. If a federal agency or the appropriate Service determines that the action is "likely to adversely affect" a listed species and/or its designated critical habitat, the Service must prepare a biological opinion on the effects of the action on the species and/or critical habitat. 50 C.F.R. § 402.14(a); *see* 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(b)(1). Where the Services find the action is likely to jeopardize the continued existence of any listed species or adversely modify or destroy any designated critical habitat, the biological opinion must include "reasonable and prudent alternatives" that "can be taken by the federal agency or applicant in implementing" the action and that the Secretary believes would avoid jeopardy or adverse modification. 16 U.S.C. § 1536(b)(3)(A). The biological opinion must also include a so-called "incidental take statement" that includes, among other things, "reasonable and prudent measures" necessary to minimize and mitigate the impacts of the proposed agency action on listed species and critical habitat. *Id*. § 1536(b)(4).

102. Section 9 of the ESA, 16 U.S.C. § 1538, prohibits any person from "tak[ing]" any endangered fish or wildlife species. *Id.* §§ 1538(a)(1)(B), (G). The ESA broadly defines "take" as to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect or attempt to engage in any such conduct." *Id.* § 1532(19). Section 9 further prohibits other actions regarding an endangered fish or wildlife species, including, but not limited to, importation, exportation, transportation, and sale. *Id*. § 1538(a)(1)(A), (D)-(F). Finally, Section 9 prohibits any person from undertaking certain harmful actions with respect to any endangered plant species. *Id.* § 1538(a)(2)(A)-(D).

103. Section 4(d) of the ESA, 16 U.S.C. § 1533(d), requires FWS to issue protective regulations for threatened species upon listing ("Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species."). It further

authorizes the Services to extend by regulation any or all of the Section 9 prohibitions to any or all species listed as threatened under the ESA. *Id*. § 1533(d). Section 9 makes such regulations enforceable as to threatened species in the same manner that the Section 9 statutory prohibitions are enforceable as to endangered species. *See id*. § 1538(a)(1)(G), (a)(2)(E). Since the 1970s, FWS has extended the ESA's Section 9 prohibitions to all threatened fish, wildlife, and plant species on a default basis unless and until a species-specific Section 4(d) rule was developed. *See* Reclassification of the American Alligator and Other Amendments, 40 Fed. Reg. 44,412, 44,425 (Sep. 26, 1975) (promulgating 50 C.F.R. § 17.31 regarding threatened fish and wildlife species), as amended by Protection for Threatened Species of Wildlife, 43 Fed. Reg. 18,180, 18,181 (Apr. 28, 1978); *see* Prohibitions on Certain Uses of Endangered or Threatened Plants, Permits for Exceptions to Such Prohibitions, and Related Items, 42 Fed. Reg. 32,374, 32,380 (June 24, 1977) (promulgating 50 C.F.R. § 17.71 regarding threatened plant species).

## II. ADMINISTRATIVE PROCEDURE ACT

104. The APA, 5 U.S.C. §§ 551–706, sets forth the procedural requirements for federal agency decision-making, including the agency rulemaking process. Under the APA, a "reviewing court shall . . . hold unlawful and set aside" federal agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of procedure required by law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2). An agency action is arbitrary and capricious under the APA where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the United States*, *Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) ("*State Farm*"). In promulgating a regulation, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id*. (cleaned up).

105. An agency does not have authority to adopt a regulation that is "plainly contrary to the statute." *United States v. Morton*, 467 U.S. 822, 834 (1984); *see also* 5 U.S.C. § 706(2)(C). Where "the best reading of a statute is that it delegates discretionary authority to an agency, the role of [a] reviewing court under the APA is . . . ensuring the agency has engaged in reasoned decisionmaking" under relevant law. *Loper Bright*, 603 U.S. at 395 (cleaned up).

106. Additionally, while "[a]gencies are free to change their existing policies," they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs*., 545 U.S. 967, 981–82 (2005)). While an agency need not show that a new rule is "better" than the rule it replaced, it must acknowledge that "it is changing position," and must demonstrate that the new rule "is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." *Fed. Commc'ns. Comm'n v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009). Further, an agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy," "or when its prior policy has engendered serious reliance interests that must be taken into account." *Id.* Any "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Nat'l Cable & Telecomms. Ass'n*, 545 U.S. at 981.

## III. NATIONAL ENVIRONMENTAL POLICY ACT

107. Congress's intent in passing NEPA, 42 U.S.C. §§ 4321-47, was to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment" and "to promote efforts which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. The goals of the statute were to place upon "an agency the obligation to consider every significant aspect of the environmental impact of a proposed action" and to "ensure[] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Alabama v. U.S. Army Corps of Eng'rs*, 704 F. Supp. 3d 20, 49 (D.D.C. 2023) (cleaned up).

108. To achieve these purposes, NEPA requires the preparation of a "detailed statement," called an EIS, for any "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). At its core, NEPA requires "that agencies take a 'hard look at environmental consequences.'" *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (cleaned up). "The comprehensive 'hard look' mandated by Congress and required by the statute … must be taken objectively and in good faith, not as an exercise in form over substance and not as a subterfuge designed to rationalize a decision already made." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).

109. If the action may not significantly affect the quality of the human environment, or its impacts are unknown, the agency must still prepare an EA, unless it finds that the proposed action properly qualifies for a categorical exclusion. 42 U.S.C. § 4336(b)(2). Agencies may invoke a categorical exclusion only for a category of actions "that a Federal agency has determined normally does not significantly affect the quality of the human environment." *Id*. § 4336e(1). The Department of the Interior has adopted several narrow categorical exclusions by regulation. These include a categorical exclusion for major federal actions "that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis." *See* 43 C.F.R. § 46.210(i).

110. An agency is prohibited from relying on any categorical exclusion, however, if specified "extraordinary circumstances" exist. In such circumstances, "further analysis and environmental documents must be prepared for the action." 43 C.F.R. § 46.205(c)(1). FWS's regulations and policies establish that extraordinary circumstances exist, *inter alia*, where a proposed action may significantly affect any species listed or proposed to be listed as endangered or threatened or any critical habitat designated under the ESA; or would have uncertain or potentially significant environmental effects or unique or unknown environmental risks; or would have a direct relationship to other actions that implicate potentially significant environmental effects. *Id.* § 46.215(c), (e), (g).

## FACTUAL AND PROCEDURAL BACKGROUND

### I. THE PROPOSED AND FINAL 4(D) RULES

111. Section 4(d) of the ESA authorizes the Services to, "by regulation prohibit with respect to any threatened species any act prohibited under [ESA Section 9] with respect to endangered species." 16 U.S.C. § 1533(d). Just two years after the enactment of the ESA, in 1975, FWS extended the ESA's Section 9 prohibitions to all threatened fish and wildlife on a blanket basis unless and until a species-specific Section 4(d) rule was developed. 40 Fed. Reg. 44,412, 44,425. In 1977, FWS did the same for threatened plant species. 42 Fed. Reg. 32,374, 32,380. Taken together, these protections are referred to as the "blanket 4(d) rule."

112. In 2018, FWS proposed to rescind the blanket 4(d) rule. *See* Revision of the Regulations for Prohibitions to Threatened Wildlife and Plants, 83 Fed. Reg. 35,174 (proposed July 25, 2018). This was a "deregulatory action" adopted pursuant to President Trump's Executive Order 13771 ("Reducing Regulation and Controlling Regulatory Costs"). *Id.* at 35,176. Thousands of commenters—including many of the Plaintiff States—urged the Services to withdraw the proposal, on the grounds that it would be arbitrary, capricious, an abuse of discretion, and contrary to the ESA and the APA. Nevertheless, on August 27, 2019, FWS issued a final rule that included changes to the Section 4(d) regulations that are virtually identical to those that FWS has now adopted once again. *See* Regulations for Prohibitions to Threatened Wildlife and Plants, 84 Fed. Reg. 44,753 (Aug. 27, 2019) (the "2019 4(d) Rule").

113. Nineteen States, including many of the Plaintiff States, and two cities challenged the 2019 4(d) Rule, together with other ESA rules, in the United States District Court for the Northern District of California. *See State of Calif. et al. v. Bernhardt et al.*, No. 4:19-cv-06013-JST (N.D. Cal. filed Sept. 25, 2019). Following a change in administration, the district court granted the Services' motion to voluntarily remand the cases pending their reconsideration of the final rules. *Ctr. for Biological Diversity v. Haaland*, 641 F. Supp. 3d 835, 843 (N.D. Cal. 2022).

114. On April 5, 2024, FWS reinstated the original blanket Section 4(d) rule, and acknowledged that its original Section 4(d) rule promoted the ESA's core conservation purpose by "ensur[ing] there is never a lapse in threatened species protections." *See* Regulations

Pertaining to Endangered and Threatened Wildlife and Plants, 89 Fed. Reg. 23,919, 23,921. FWS explained that the 2024 4(d) Rule would provide a "streamlined option for protecting threatened species for situations in which we do not promulgate species-specific 4(d) rules" because in those situations where FWS does not promulgate a species-specific 4(d) rule at the time of listing, the "blanket rule" protections "will be in place to provide for the conservation of that threatened species." *Id*.

115. On November 21, 2025, however, FWS proposed to rescind the 2024 4(d) Rule that had reinstated the blanket 4(d) rule. 90 Fed. Reg. 52,587 ("2025 Proposed 4(d) Rule"). As had been the case with the 2019 4(d) Rule, FWS proposed to end the blanket 4(d) rule's protections for newly listed threatened species. *Id*. at 52,587–88. FWS also proposed to require an explicit determination that any such species-specific Section 4(d) rule is "necessary and advisable to provide for the conservation of that species," including a consideration of the economic impacts of providing such protections. *Id.* at 52,589.

116. FWS's cited impetus for the 2025 Proposed 4(d) Rule was an Executive Order and a related Order of the Secretary of the Interior. Specifically, FWS asserted that Executive Order 14154, "Unleashing American Energy," issued January 20, 2025, "directed all departments and agencies to review agency actions that impose an undue burden on the identification, development, or use of domestic energy resources, and, as appropriate and consistent with applicable law, consider suspending, revising, or rescinding agency actions that conflict with this national objective." *Id*. at 52,588. FWS also explained that Secretarial Order 3418, issued on February 3, 2025, directed the Assistant Secretaries to take steps "to suspend, revise, or rescind multiple actions that had been finalized under the prior Administration," and that the Order specifically required FWS to rescind the 2024 4(d) Rule. *Id*.

117. In the 2025 Proposed 4(d) Rule, FWS also referenced Executive Order 14219, "Ensuring Lawful Governance and Implementing the President's 'Department of Government Efficiency' Deregulatory Initiative," issued on February 19, 2025, which directed all departments and agencies to review and rescind allegedly unlawful regulations that are "based on anything other than the best reading of the underlying statutory authority." *Id*. at 52,588–89. FWS asserted

that the rescission of the 4(d) blanket rule was necessary because it represents the "'single, best meaning' of the statute" and that "[t]he statutory text, structure, and context make clear that Congress intended for the Service to determine what protections are needed for threatened species on a species-by-species basis." *Id.* at 52,589 (quoting *Loper Bright*, 603 U.S. at 400). In the 2025 Proposed 4(d) Rule, FWS further claimed that rescinding the blanket rule would remove permitting burdens and make better use of its personnel. *Id*.

118. The 4(d) Rule is identical to the 2025 Proposed 4(d) Rule. *Compare* 90 Fed. Reg. at 52,591–92 *with* 91 Fed. Reg. at 45,736. FWS's reasoning, however, shifted between the 2025 Proposed 4(d) Rule and the 4(d) Rule. FWS now claims that, "[w]hile [Executive Orders] 14154 and 14219 initiated [its] review, [its] goal in revising these regulations was to determine how best to craft protective regulations for threatened species under section 4(d) of the [ESA] while also considering our experience administering the [ESA] and policy preferences." 91 Fed. Reg. at 45,724. FWS also contends that rescinding the blanket rule "ensures that the Service will thoughtfully consider the protections that are necessary and advisable for the conservation of each threatened species." *Id.*

119. But FWS does not explain how the 4(d) Rule will affect its ability to conserve threatened species, and why it thinks this is a better approach for the conservation of these species than the blanket 4(d) rule. *Id*. at 45,724–25. Rather, FWS focuses primarily on the fact that it considers removing future use of the blanket rule for threatened species to be "a superior choice from a policy perspective" and that it will reduce future permitting burdens. *Id.* at 45,724. FWS also claims that the purpose of the 4(d) Rule was to align its policy with that of NMFS, *id.* at 45,725, which only issues species-specific rules, but which is also responsible for far fewer species than is FWS.

120. In the 4(d) Rule, FWS also declined to include a requirement that FWS promulgate species-specific rules concurrent with final species listing or reclassification determinations no later than 180 days following such determination, as commenters had suggested. *Id.* at 45,725, 45,731.

## II. The Proposed and Final Habitat Exclusion Rules

121. On September 8, 2020, FWS proposed a rule to establish a process for excluding critical habitat from designation. *See* Regulations for Designating Critical Habitat, 85 Fed. Reg. 55,398 (proposed Sep. 8, 2020). Specifically, as in the Habitat Exclusion Rule which it is nearly identical, FWS proposed to impose a new mandatory obligation on FWS to undertake an "exclusion analysis" when a "proponent of excluding a particular area . . . presented credible information regarding . . . meaningful economic" or other impacts supporting exclusion and proposed to require FWS to defer to outside experts on a variety of impacts. *Id.* at 55,406–07. If FWS determined that the benefits of excluding a particular area outweighed the benefits of including that area as critical habitat, the proposed rule provided that FWS "shall exclude" that area, unless exclusion would result in the extinction of a species. *Id*. at 55,407. The 2020 proposed habitat exclusion rule also reversed FWS's 2016 policy of prioritizing federal lands for critical habitat designation by requiring it to consider information supporting the exclusion of federal lands based on a variety of economic impacts, such as federal agencies' ESA consulting costs and applicants' costs during the Section 7 consultation process. *Id.* at 55,402.

122. Many of the State Plaintiffs submitted comments opposing the 2020 proposed habitat exclusion rule, urging the Services to withdraw it on the grounds that it would, if finalized, be unlawful, arbitrary, capricious, and contrary to the ESA, NEPA, and the APA, and would harm the signatory States' interests. Despite significant opposition, on December 18, 2020, FWS issued the 2020 Habitat Exclusion Rule exactly as it had been proposed. 85 Fed. Reg. 82,376 (Dec. 18, 2020).

123. Many of the State Plaintiffs filed a lawsuit challenging the 2020 Habitat Exclusion Rule. The case was stayed pending the Biden Administration's reconsideration of the rule. *See State of California et al. v. Bernhardt et al*., No. 4:21-cv-00440 (N.D. Cal. filed Jan. 19, 2021).

124. On October 27, 2021, FWS proposed to rescind the 2020 Habitat Exclusion Rule on the grounds that, *inter alia*, it "unduly constrained the Service's discretion in administering the [ESA]" and "undermin[ed] the Service's role as the expert agency." *See* Regulations for Designating Critical Habitat, 86 Fed. Reg. 59,346, 59,347 (proposed Oct. 27, 2021). FWS also

stated that the 2020 Habitat Exclusion Rule afforded undue deference to third parties, which did not advance the ESA's conservation goals, and "could also be at odds with the [ESA's] mandate to base designations on the best scientific data available." *Id.* at 59,349. FWS further acknowledged that the approach to federal lands outlined in its 2016 policy preserved FWS's flexibility and the Secretary's discretion with regard to exclusion decisions. *See id*. at 59,350.

125. On July 21, 2022, FWS finalized its rescission of the 2020 Habitat Exclusion Rule. *See* Regulations for Designating Critical Habitat, 87 Fed. Reg. 43,433 (July 21, 2022). Similar to its statements in the 2021 proposed rescission, FWS concluded that the 2020 Habitat Exclusion Rule "limits or undermines the Service's role as the expert agency; it constrains the Service's discretion, thus decreasing the agency's ability to further the conservation of endangered and threatened species through designation of their critical habitats; and it does not further the goal of providing clarity and transparency and instead creates confusion." *Id.* at 43,434–35. FWS also reestablished the primacy of the 2016 policy in governing how FWS would implement Section 4(b)(2). *Id*. at 43,434.

126. On September 15, 2022, in response to the 2022 Habitat Exclusion Rescission, the state plaintiffs in *State of California et al. v. Bernhardt et al.* voluntarily dismissed without prejudice the multistate action challenging the 2020 Habitat Exclusion Rule.

127. On November 21, 2025, FWS proposed to readopt the 2020 Habitat Exclusion Rule. *See* Regulations for Designating Critical Habitat, 90 Fed. Reg. 52,592 (proposed Nov. 21, 2025) (the "2025 Proposed Habitat Exclusion Rule"). FWS explained that its impetus for the proposed reinstatement was the same Executive Order and Secretarial Order directing the agency to remove the "burden[s] on the identification, development, or use of domestic energy resources," that had motivated FWS's proposed changes to the 4(d) Rule. *Id.* at 52,593.

128. The 2025 Proposed Habitat Exclusion Rule replicated several unlawful elements of the 2020 Habitat Exclusion Rule. *See* 90 Fed. Reg. at 52,598–99. In particular, the Proposed Habitat Exclusion Rule:

a. Mandated that FWS conduct a critical habitat exclusion analysis in any case where a "proponent of excluding a particular area . . . presented credible information regarding

the existence of a meaningful economic or other relevant impact supporting a benefit of exclusion”;

b. Required FWS to defer to outside “experts” in, or “sources with firsthand knowledge of,” a non-exhaustive list of impacts deemed “outside of the scope of [FWS]’s expertise”—including some biological impacts within FWS’s expertise—when analyzing the benefits of including or excluding an area from designation as critical habitat unless FWS had “knowledge or material evidence that rebuts that information”;

c. Biased the required economic analysis against designating critical habitat for species conservation and instead favored excluding both federal and non-federal lands from such designations;

d. Reversed FWS’s prior 2016 policy—which prioritized designation of critical habitat on federal lands—by authorizing more regular exclusion of federal lands from critical habitat designation through its requirement that FWS consider exclusion of federal lands based on broadly defined “impacts,” such as opportunity costs associated with Section 7 consultations and undefined “community interests,” which include costs borne by applicants to modify a project to avoid habitat impacts; and

e. Required FWS to consider implementation of conservation plans, agreements, and partnerships authorized by incidental take permits under Section 10 of the ESA when determining whether to exclude areas covered by such plans from critical habitat.

129. The Habitat Exclusion Rule adopts these proposals in full, with two minor textual updates. 91 Fed. Reg. 45,662, 45,664. Otherwise, FWS entirely declined to implement any changes in response to the comments it received. *Id*. at 45,667. FWS also expressly acknowledges that, in certain circumstances, exclusion analyses will be mandatory under the Habitat Exclusion Rule. *Id.* at 45,668–69. Rather than acknowledge the enormously constrictive effect of this policy on FWS’s discretion in designating critical habitat, however, FWS adopts the Orwellian view that adopting a policy limiting its discretion is itself an exercise of discretion: “[t]he rule does not waive the Secretary’s discretion; instead, the regulation constitutes the Secretary’s decision on how to exercise his discretion under the Act on a consistent comprehensive basis.” *Id*. at 45,669.

### III. Final 4(d) and Habitat Exclusion Rules' Lack of NEPA Compliance

130. The Final Rules are major federal actions that will significantly affect the human environment under NEPA. FWS, however, opted not to prepare an EA or an EIS for the 2025 Proposed 4(d) Rule and the 2025 Proposed Habitat Exclusion Rule as required by NEPA. Instead, FWS erroneously contends that the Final Rules are categorically excluded from NEPA review because they "are of an administrative, financial, legal, technical, or procedural nature." 91 Fed. Reg. at 45,681; 91 Fed. Reg. at 45,736 (both citing 43 C.F.R. § 46.210(i)). FWS also claims that the Final Rules would not have any significant effect on the environment because each rule is "purely a regulatory framework." U.S. Fish & Wildlife Serv., Additional Documentation for Environmental Action Statement, July 17, 2026, Doc. ID FWS-HQ-ES-2025-0029-14626, https://www.regulations.gov/document/FWS-HQ-ES-2025-0029-14626 ("4(d) Rule Categorical Exclusion Documentation"); U.S. Fish & Wildlife Serv., Additional Documentation for Environmental Action Statement, July 17, 2026, Doc. ID FWS-HQ-ES-2025-0048-12537, https://www.regulations.gov/document/FWS-HQ-ES-2025-0048-12537 ("Habitat Exclusion Rule Categorical Exclusion Documentation").

### IV. Impacts of the Final Rules on State Plaintiffs

131. State Plaintiffs are harmed by the Final Rules because they undermine and weaken key requirements of the ESA, to the detriment of the States and the imperiled species in their jurisdictions.

132. First, State Plaintiffs have a concrete interest in preventing harm to their natural resources, both in general and under the ESA in particular. Indeed, in most of the Plaintiff States, fish and wildlife resources are owned and held by that State in both a proprietary and regulatory capacity in trust for the benefit of the entire people of that State. State Plaintiffs also hold a quasi-sovereign interest in their environment and natural resources. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982); *Maryland v. Louisiana*, 451 U.S. 725, 737–38 (1981). Weakened protections for ESA-listed species and critical habitat injure State Plaintiffs in their proprietary capacity both as landowners and as regulatory trustees of their fish and wildlife resources. State Plaintiffs thus have an important interest in preventing and remedying harm to

endangered and threatened species and their habitat that either temporarily or permanently reside within and across State Plaintiffs' borders. The Final Rules' weakening of protections for threatened species and critical habitat significantly and adversely affects the fish, wildlife, and plants in the Plaintiff States. The Final Rules also curtail Plaintiff States' ability to help prevent federally listed species from sliding further toward extinction. Protection of listed species' habitat is increasingly important given the mounting pressures of climate change, which makes species even more vulnerable to the dangers of habitat loss.

133. For example, the 4(d) Rule directly impacts the State Plaintiffs' interest in preventing harm to threatened species because there are currently many species that are proposed to be listed as threatened in our States. These include, among others, the monarch butterfly (*Danaus plexippus*), the northwestern pond turtle (*Actinemys marmorata*), and the green floater mussel (*Lasmigona subviridus*). Therefore, if FWS decides to list these species as threatened, FWS may not afford them Section 9 protections applicable to endangered species immediately upon listing, and such species may be left without such protections until a species-specific 4(d) rule is promulgated, potentially years later.

134. Second, and relatedly, States have a concrete interest in the "esthetic, ecological, educational, historical, recreational, and scientific value" of species of fish, wildlife, and plants. 16 U.S.C. § 1531(a)(3). Reducing our wealth of wild species damages each of these values and "diminish[es] a natural resource that could otherwise be used for present and future commercial purposes." *National Ass'n of Home Builders v. Babbitt*, 130 F.3d 1041, 1053 (D.C. Cir. 1997); *see also San Luis & Delta–Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1176–77 (9th Cir. 2011). The harm that results from the loss of biological diversity is quite literally "incalculable," due to the "*unknown* uses that endangered species might have and . . . the *unforeseeable* place such creatures may have in the chain of life on this planet." *TVA. v. Hill*, 437 U.S. at 178–79; *see also id.* at 187.

135. Third, State Plaintiffs have proprietary regulatory interests in FWS's full compliance with the ESA's plain language and overriding conservation mandate. The Final Rules weaken critical protections for threatened species and critical habitat under the ESA and increase the

burden on States to fill the significant regulatory and enforcement gaps created by FWS's abdication of its duty to protect the nation's irreplaceable biological resources. Many State Plaintiffs have laws and regulations that protect species within their borders. Many State Plaintiffs also own lands, and have programs to acquire and protect properties, that are home to endangered and threatened species and critical habitat. In such circumstances, FWS and State Plaintiffs take account of their respective efforts to conserve rare species and often work cooperatively to share the responsibility and workload required for their protection. *See* 16 U.S.C. § 1535(c). With the Final Rules, State Plaintiffs will now bear significantly greater responsibility for protecting threatened species and critical habitat under existing state laws and programs, including, but not limited to state listings, habitat protection programs, take permits, and enforcement actions.

136. As just one example, under the 4(d) Rule, species newly listed as threatened under both federal law and a State's law would be subject to a "take" prohibition only under the State's law. *See, e.g.*, Mass. Gen. Laws ch. 131A, § 2; Cal. Fish & Game Code §§ 2080, 2085. Even if FWS opts to create a species-specific take rule, the State would need to shoulder the costs of conservation of threatened species while FWS clears its backlog and crafts such a rule, which might ultimately provide substantially weaker protections than those the species would have been afforded under the previous blanket take rule. *See Air All. Hous. v. Env't Prot. Agency*, 906 F.3d 1049, 1059–60 (D.C. Cir. 2018) ("Monetary expenditures to mitigate and recover from harms that could have been prevented absent the [federal rule] are precisely the kind of 'pocketbook' injury that is incurred by the state itself."). Further, for States that manage threatened species consistent with Section 6 cooperative agreements entered into pursuant to 16 U.S.C. § 1535, the 4(d) Rule will require additional state effort to comply with a patchwork of species-specific rules when conducting conservation activities.

137. Fourth, and relatedly, the States have a concrete interest in upholding the longstanding cooperative federalism relationship between FWS and the States as mandated by the ESA. The ESA specifically directs FWS to "cooperate to the maximum extent practicable with the States" in implementing the ESA and gives State Plaintiffs a distinct role in ensuring faithful

and fully informed implementation of the ESA's species conservation mandates. 16 U.S.C. § 1535(a); *see also* 16 U.S.C. § 1531(a)(5) (encouraging state species conservation); *id.* § 1533(b)(1)(A), (b)(1)(B)(ii) (accounting for state efforts to protect listed species); *id.* §§ 1533(b)(5), 1536(a)(2) (state consultation requirements for critical habitat designation); *id.* § 1533(b)(7) (requiring Services to provide specific notice to any affected state of publication of an emergency listing regulation); *id.* § 1533(g) (monitoring of recovered species in cooperation with States); *id.* § 1533(i) (heightened justification required where listing or critical habitat regulations are inconsistent with state agency's comments or petition); *id.* § 1535 (requiring Services generally to cooperate with States in implementing the ESA); *id.* § 1536(e) (each affected State must be represented on Endangered Species Committee established during consultation exemption procedure); *id.* § 1536(g) (state governors included in consultation exemption application process); *id.* § 1537a(e)(2) (States to participate in implementation of the Western Convention); *id.* § 1540(e)(1) (Services may use state agency resources to enforce the ESA).

138. For decades, State Plaintiffs have relied on the blanket 4(d) rule and critical habitat regulations to assist them in protecting threatened species and critical habitat both within and across state borders. This beneficial cooperation has included States working with FWS to implement the ESA's important policies and programs, including, among other things, Section 10(a)(1)(B) incidental take permits, Section 10(a)(1)(A) conservation benefit agreements, and listed species recovery plans under Section 4(f). Historically, FWS's emphasis on critical habitat designations on federal lands—exemplified by the 2016 policy—has also complemented state programs by ensuring States are not solely responsible for protecting habitat on their land. The Final Rules will upset this balance, and force State Plaintiffs to fill the resulting regulatory gaps, creating significant additional financial, administrative, and regulatory burdens for our States. *See New Jersey v. Env't Prot. Agency*, 989 F. 3d 1038, 1046 (D.C. Cir. 2021) (noting that "exacerbated [state] administrative costs and burdens imposed by [a federal rule] . . . constitute a concrete and particularized injury").

139. Fifth, the Final Rules will cause economic harm to State Plaintiffs because they shift more of the responsibility for, and the financial, administrative and regulatory burden of,

protecting threatened species and critical habitat within state borders to State Plaintiffs. *See California v. Azar*, 911 F.3d 558, 571–73 (9th Cir. 2018) (impact on state economic interests provides basis for standing). This will detract from State Plaintiffs' efforts and resources available to carry out their own programs and impose significantly increased financial, administrative, and regulatory burdens on State Plaintiffs. *See Air Alliance*, 906 F.3d at 1059-60.

140. Moreover, while State Plaintiffs can act to protect imperiled species within their own borders, they cannot do the same when those species that are outside of their borders. Thus, despite the resource-intensive efforts described above, the State Plaintiffs may not be able to wholly fill the regulatory gaps created by the Final Rules because other non-plaintiff States that host species with inter-state ranges may not adequately protect endangered or threatened species under their state laws.

141. The ESA's species and habitat protections, including those implemented through the blanket 4(d) rule, also promote statewide and national economic benefits. For example, protection of critical habitat supports not only listed species, but diverse habitats that support wildlife tourism, recreation, and other beneficial economic activities. Indeed, wildlife tourism generates billions of dollars annually for all States while supporting thousands of jobs. In 2022 alone, FWS reports that over 145 million people engaged in wildlife watching activities in the United States, leading to increased jobs in both the private and public sectors. Protected nature preserves also create higher residential land values. Additionally, habitat protections can benefit hunters, fishers, and trappers because protection of imperiled species' habitats can help to support healthy populations of non-listed game species.

142. Finally, the Services' failure to prepare an EIS, or even an EA, for the Final Rules, and provide sufficient opportunity for public notice and comment, has harmed State Plaintiffs' procedural interests in participating in a legally-sound rulemaking and environmental review. This failure to prepare an EIS or EA does not allow for the adequate consideration of the impacts of federal rulemaking on the State Plaintiffs' natural resources, including listed species and their habitat. It also prevents the sufficient identification and analysis of possible mitigation measures to reduce such impacts to less-than-significant levels. *See generally Robertson v. Methow Valley*

*Citizens Council*, 490 U.S. 332, 352 (1989) ("omission of a reasonably complete discussion of possible mitigation measures [] undermine[s] the 'action-forcing' function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects" (citation omitted)).

143. Consequently, State Plaintiffs have suffered and will continue to suffer legal wrongs and concrete injuries as a result of FWS's actions and have standing to bring this suit. Declaring the Final Rules contrary to law and arbitrary and capricious, and vacating these actions, will redress the harm suffered by State Plaintiffs.

**FIRST CAUSE OF ACTION**
**(Violations of the ESA and APA—4(d) Rule,**
**16 U.S.C. §§ 1532, 1533, 1536; 5 U.S.C. § 706)**

144. Paragraphs 1 through 143 are realleged and incorporated herein by reference.

145. Under the APA, a "reviewing court shall . . . hold unlawful and set aside" agency actions found to be "an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). An agency does not have authority to adopt a regulation that is "plainly contrary to the statute." *United States v. Morton*, 467 U.S. 822, 834 (1984).

146. Here, FWS's adoption of the 4(d) Rule violates the ESA's plain language, structure, and purpose, and exceeds the scope of FWS's jurisdiction, authority, and discretion under the ESA in several ways.

147. The 4(d) Rule's rescission of the "blanket rule," which automatically extended all Section 9 take prohibitions to newly listed threatened species, is contrary to the overarching conservation purposes and mandate of the ESA, FWS's conservation obligations in the ESA, 16 U.S.C. §§ 1531(b), (c)(1), 1536(a)(1), the conservation purpose of Section 4(d) itself, *id.* § 1533(d) (regulations protecting threatened species must be "necessary and advisable to provide for the *conservation* of such species" (emphasis added)), and the ESA's policy of "institutionalized caution," *TVA v. Hill*, 437 U.S. at 194, because it will result in inadequate ESA protections for newly listed threatened species.

148. Further, the 4(d) Rule's rescission of the "blanket rule" violates FWS's mandatory duty to issue protective regulations for threatened species upon listing. 16 U.S.C. § 1533(d) ("Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species."). Because FWS has now terminated the automatic extension of Section 9 protections to newly listed threatened species, those species, including those downlisted from endangered to threatened, are left with no Section 9 protections unless and until FWS promulgates a species-specific 4(d) rule.

149. The requirement that each prospective species-specific rule must "include a necessary and advisable determination (including consideration of conservation and economic impacts)," 91 Fed. Reg. at 45,725, also contravenes the text and purposes of the ESA. In contrast to FWS's new rule, Section 4(d) directs that regulations protecting threatened species must be "necessary and advisable to provide for the *conservation* of such species," 16 U.S.C. § 1533(d) (emphasis added). The ESA's broad definition of "conservation" as using "*all methods and procedures* which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary" leaves no room for the consideration of economic factors. *Id*. § 1532(3) (emphasis added).

150. Further, the requirement for species-specific rules will upend the conservation mandate and precautionary principle enshrined in the ESA, *see TVA v. Hill*, 437 U.S. at 178, 194, because it will likely cause significant delays while FWS develops species-specific rules, during which time no Section 9 protections will be in place for newly listed threatened species. And some newly listed species may never receive Section 9 protections if FWS determines that a species-specific rule is not "necessary and advisable" due to its economic impacts or other factors. FWS has implemented the ESA's conservation mandate for decades by instituting default Section 9 protections for threatened species to prevent them from sliding further toward extinction while the details of the specifically tailored rules, if any, are developed.

151. Accordingly, in promulgating the 4(d) Rule, FWS acted in a manner that is contrary to law and an abuse of discretion, and in excess of FWS's statutory jurisdiction and authority, in

violation of the ESA and the APA. 16 U.S.C. §§ 1531–1533, 1536; 5 U.S.C. § 706. Consequently, the 4(d) Rule should be held unlawful and set aside.

**SECOND CAUSE OF ACTION**
**(Violations of the APA—4(d) Rule,**
**5 U.S.C. § 706)**

152. Paragraphs 1 through 151 are realleged and incorporated herein by reference.

153. Under the APA, a reviewing court must hold unlawful and set aside agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). An agency regulation is arbitrary, capricious, and an abuse of discretion under the APA if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (cleaned up). A regulation is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

154. When an agency changes its prior approach, it must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy," including providing "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 566 U.S. 502, 515–16 (2009). Further, when "its new policy rests upon factual findings that contradict those which underlay its prior policy" (as is the case here, given that the change is a radical departure from longstanding agency regulations), an agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* at 515.

155. FWS claims that the "impetus for reviewing and revising" the 4(d) regulations was Executive Orders 14154 and 14219, of which the latter directs all departments and agencies to review and rescind unlawful regulations that are "based on anything other than the best reading of

the underlying statutory authority." 91 Fed. Reg. at 45,724 (citing *Loper Bright*, 603 U.S. at 400). But in *Loper Bright*, the Supreme Court held that a reviewing court must independently determine whether to uphold an agency regulation based on the *court's* interpretation of the "best meaning" of the statute, not whether the *agency's* interpretation was the "best meaning" of the statutory scheme. *Id.* at 400, 408–09. While federal agencies have a duty—as they always have—to reasonably interpret and faithfully implement the governing statutory scheme, FWS has mistakenly read a new obligation into *Loper Bright* for it to re-evaluate its existing regulations for consistency with its own view of the "best meaning" standard. That approach is both misguided and particularly inapposite in the context of the longstanding blanket 4(d) rule that FWS rescinds here. In *Loper Bright*, the Supreme Court noted that agency interpretations "issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Id.* at 394 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). FWS's 2024 4(d) Rule restored the longstanding regulatory framework adopted nearly contemporaneously with Congress's enactment of the ESA over fifty years ago, which faithfully implemented the ESA's conservation mandate and purpose to protect threatened species. The 2024 4(d) Rule was consistent with the "best reading" of the ESA because it constituted an exercise of FWS's discretion that adhered to the ESA's purpose. Here, FWS altogether disregards that contemporaneous "best reading."

156. In adopting the 4(d) Rule, FWS also failed to engage in "reasoned decisionmaking," as required by *Loper Bright,* which expressly recognized that the "best reading" of certain statutes may authorize agencies to exercise a degree of discretion if that is contemplated by the statutory text. *Loper Bright*, 603 U.S. at 395. Here, Section 4(d) requires the Secretary to promulgate such protective regulations "as he deems necessary and advisable to provide for the conservation of" threatened species and provides that the Secretary "may" extend Section 9 protections to threatened species, and thus expressly grants the Secretary discretion to promulgate such rules. 16 U.S.C. § 1533(d). Where, as here, "the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is . . . ensuring the agency has engaged in reasoned decisionmaking." *Loper Bright*, 603 U.S. at 395 (cleaned up). For the

following reasons, FWS did not engage in reasoned decisionmaking when promulgating the 4(d) Rule:

a. FWS provided no reasoned basis for abandoning its longstanding policy and practice of providing default Section 9 protections to all newly listed threatened species;

b. While FWS points to certain claimed benefits of species-specific rules, such as reducing "permitting burdens" on FWS and regulated entities, 91 Fed. Reg. at 45,724–25, it fails to acknowledge that FWS already had the ability to promulgate species-specific rules for every threatened species for which it chose to do so under the prior blanket 4(d) rule. This argument further defies logic because promulgating species-specific rules demands far more agency time and resources than does reliance on the blanket 4(d) rule. FWS fails to acknowledge its backlog of unprotected species, processing times that are already too slow, staff shortages, and recent attempts to terminate hundreds of FWS employees, including those that implement the ESA, which will make it even less likely that FWS can issue species-specific rules within any reasonable time frame. FWS also fails to explain how it is going to manage the additional workload required to create species-specific rules for all newly listed threatened species, and how this may affect its future ability to list and conserve threatened species under the ESA;

c. FWS's rationale of aligning its policy with NMFS's approach ignores the material differences between the two agencies in terms of the number of species they manage and the resources each has available to promulgate species-specific rules. *See* 91 Fed. Reg. at 45,725. FWS fails to acknowledge that FWS has jurisdiction over 2,388 species, compared to only 165 for NMFS, and that over 500 species are awaiting status reviews and consideration for listing from FWS, compared to only 48 for NMFS; and

d. Further, FWS's attempt to justify adding economic considerations to 50 C.F.R. §§ 17.31(d) and 17.71(d) to provide transparency and to address *Kansas Natural Resources Coalition, et al. v. FWS,* 780 F. Supp. 3d 650 (W.D Tex. 2025), does not amount to a reasoned explanation because the cases that the *Kansas Natural Resources* court relied on did not address the ESA and rather addressed statutes, such as the Magnuson-Stevens Fishery Conservation and Management Act, that contain express language that economic costs must be considered.

157. Accordingly, FWS acted in a manner that was arbitrary, capricious, and an abuse of discretion, and failed to follow the procedures required by law, in violation of the APA. 5 U.S.C. § 706. FWS further relied on factors Congress did not intend for it to consider, such as administrative expediency and relief of regulatory burdens, and entirely overlooked important issues at the heart of its species-protection duties under the ESA. *See State Farm*, 463 U.S. at 43. Consequently, the 4(d) Rule should be held unlawful and set aside.

**THIRD CAUSE OF ACTION**
**(Violations of the ESA and APA—Habitat Exclusion Rule,**
**16 U.S.C. §§ 1532, 1533, 1536; 5 U.S.C. § 706)**

158. Paragraphs 1 through 157 are realleged and incorporated herein by reference.

159. Under the APA, a "reviewing court shall . . . hold unlawful and set aside" agency actions found to be "an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). An agency does not have authority to adopt a regulation that is "plainly contrary to the statute." *Morton*, 467 U.S. at 834.

160. Here, FWS's adoption of the Habitat Exclusion Rule violates the ESA in that it is contrary to the Section 4 critical habitat designation requirements in 16 U.S.C. § 1533(a)(3)(A) and (b)(2); the Section 7 consultation requirements in 1536(a)(2) and (b); and the ESA's conservation purposes and mandate and FWS's species conservation obligations in 16 U.S.C. §§ 1531(b) and (c) and 1536(a)(1).

161. The new process for conducting economic impact analyses in 50 C.F.R. § 17.90(a), (c), and (e) unlawfully conflates the initial, mandatory economic impact analysis with the subsequent, discretionary critical habitat exclusion analysis under ESA Section 4(b)(2). Section (4)(b)(2) of the ESA provides that FWS "shall designate critical habitat . . . on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact." 16 U.S.C. § 1533(b)(2). Only then may FWS "exclude any area from critical habitat." *Id.* This language contemplates a two-step process where FWS must "consider economic impact and relative benefits *before* deciding whether to exclude

an area from critical habitat." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 25 (2018) (emphasis added); *accord Bldg. Indus. Ass'n of the Bay Area v. U.S. Dep't of Com.*, 792 F.3d 1027, 1033 (9th Cir. 2015) ("we read the statute to provide that, *after* the agency considers economic impact, the entire exclusionary process is discretionary") (emphasis added). Only *after* it completes that review, may it opt to analyze whether to exclude any particular area from critical habitat, as a second step in the process. 16 U.S.C. § 1533(b)(2); *Weyerhaeuser*, 586 U.S. at 24. The new process, which requires that FWS "will identify" areas for exclusion simultaneously with FWS's initial economic analysis, 91 Fed. Reg. at 45,682, therefore violates the plain language of Section 4(b)(2) of the ESA.

162. The Habitat Exclusion Rule also sets forth an unlawfully broad list in 50 C.F.R. § 17.90(a) and (d)(1) of "economic impacts" and "other relevant impacts" that FWS must consider in its economic impact analysis. The list includes routine regulatory costs that do not in any way justify exclusion of areas from critical habitat designations and unlawfully encourages more widespread exclusions of federal land from critical habitat designations. 91 Fed. Reg. at 45,682. This approach is likely to result in a significant reduction in critical habitat designations, which is contrary to FWS's and federal action agencies' duties under Section 7, the fundamental conservation purpose of the ESA, and the recovery purpose of critical habitat designations. *See* 16 U.S.C. §§ 1532(5), 1536(a)(1), (a)(2), (b).

163. The requirements in 50 C.F.R. § 17.90(c)(2) and (e) that FWS "will" conduct an exclusion analysis when a "proponent of excluding a particular area . . . has presented credible information regarding the existence of a meaningful economic or other relevant impact supporting a benefit of exclusion for that particular area" and "shall exclude" an area from critical habitat designation if FWS "determines that the benefits of excluding a particular area from critical habitat outweigh the benefits of specifying that area as part of the critical habitat" are contrary to 16 U.S.C. §§ 1533(a)(3)(A) and (b)(2). Under these ESA provisions, FWS is under no obligation to conduct an exclusion analysis and retains discretion whether to do so. *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 990 (9th Cir. 2015). The Habitat Exclusion Rule, by contrast, mandates that FWS conduct an exclusion analysis in every instance in which a

proponent of exclusion requests such an analysis, contradicting the plain language of the ESA. Additionally, the ESA tempers FWS's discretion regarding critical habitat exclusions by mandating that FWS designate critical habitat concurrently with the listing of an endangered or threatened species "to the maximum extent prudent and determinable." 16 U.S.C. § 1533(b)(3)(A). Moreover, Congress specified that the fundamental purpose of critical habitat designation is to provide for the species' recovery. *Id*. § 1532(5). Congress therefore clearly intended exclusion analyses to be the exception rather than the rule, so as to enable critical habitat to assist in achieving the ESA's overarching conservation purposes and mandate, which FWS is duty bound to implement. *Id*. §§ 1531(b),(c), 1536(a)(1).

164. The requirement in 50 C.F.R. § 17.90(d)(1) that, when conducting a discretionary exclusion analysis, FWS defer to outside "experts in" or those with "firsthand knowledge of" areas that "*may* be outside of the scope of [FWS]'s expertise" unless FWS has "knowledge or material evidence" rebutting that information, and that FWS only consider information from proponents of critical habitat exclusion, *see* 91 Fed. Reg at 45,682, also is contrary to 16 U.S.C. § 1533(a)(3)(A) and (b)(2) and the ESA's conservation purposes and mandate, *id.* §§ 1531(b), (c), 1536(a)(1). It requires FWS to defer to third-party promoters of an exclusion, even where FWS itself is the expert, in violation of the ESA's requirement that FWS base critical habitat determinations on its own independent professional judgment, using the best available science. *Id.* § 1533(b)(2).

165. The requirement in 50 C.F.R. § 17.90(d)(3) that FWS consider implementation of conservation plans, agreements, or partnerships authorized by an incidental take permit under Section 10 of the ESA is contrary to 16 U.S.C. §§ 1533(a)(3)(A) and (b)(2), and 1536(a)(2) and (b)(4), and the ESA's conservation purposes and mandate in 16 U.S.C. §§ 1531(b) and (c), and 1536(a)(1). This requirement conflates the regulatory standard for "take" with the relevant standard for Section 7 consultations relating to critical habitat: whether action may result in the "destruction or adverse modification" of designated critical habitat. *See* 16 U.S.C. § 1536(a)(2). While conservation plans, agreements, and partnerships are important for species conservation, they are no substitute for critical habitat designations required under the statute.

166. Accordingly, in promulgating the Habitat Exclusion Rule, FWS acted in a manner that was contrary to law, an abuse of discretion, and in excess of FWS's statutory jurisdiction and authority, in violation of the ESA and the APA. 16 U.S.C. §§ 1531–33, 1536; 5 U.S.C. § 706. Consequently, the Habitat Exclusion Rule should be held unlawful and set aside.

**FOURTH CAUSE OF ACTION**
**(Violations of the APA—Habitat Exclusion Rule,**
**5 U.S.C. § 706)**

167. Paragraphs 1 through 166 are realleged and incorporated herein by reference.

168. As discussed above, if an agency fails to "examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made," a reviewing court may find its action "arbitrary, capricious, [or] an abuse of discretion" and hold that action unlawful under the APA. *State Farm*, 463 U.S. at 43, 41 (cleaned up). Regulations may be unlawful if the agency's rationale is based on improper factors or does not otherwise appear to be the product of reasoned decisionmaking. *Id.* at 30–31. When an agency changes its prior approach, it must acknowledge that it is changing course and provide a reasoned explanation that demonstrates good reasons for its new policy. *See Fed. Commc'ns Comm'n v. Fox Television Stations*, 556 U.S. at 513–15. And where an agency's action contradicts past factual findings, agencies must provide more detailed justifications than they would for a "new policy created on a blank slate." *Id.* at 515.

169. FWS violated the APA by failing to adequately consider and explain several aspects of the Habitat Exclusion Rule that prioritize economic considerations and critical habitat exclusions over designation of critical habitat and conservation of endangered and threatened species. In particular, and contrary to its assertions, FWS failed to provide a logical refutation of its own 2022 findings. *See* 87 Fed. Reg. at 43,433. At that time, FWS rejected the nearly identical 2020 Habitat Exclusion Rule as "problematic," finding that that the exclusion analysis process unduly constrained its discretion; the "credible information" standard was "vague;" the rule promoted undue reliance on outside parties and gave proponents of particular exclusions "an outsized role;" and, most notably, that "the [2020 Habitat Exclusion Rule] does not accomplish

the goal of providing clarity and transparency." 87 Fed. Reg. at 43,435, 43,437–38. FWS now inexplicably adopts the same rule it explicitly stated *did not* promote transparency and clarity because it claims it will "provide greater transparency and certainty." 91 Fed. Reg. at 45,662, 45,672, 45,676–79.

170. In addition to adopting a rationale FWS itself disclaimed four years ago, FWS also acted in an arbitrary and capricious manner because:

a. FWS failed to justify its sudden consideration of "opportunity costs," including costs to federal permittees and licensees resulting from the need for Section 7 compliance, as a compelling reason for FWS to exclude federal lands from critical habitat designations;

b. FWS failed to adequately consider the impacts on listed species and critical habitat by allowing a proponent of critical habitat exclusion to present—and *requiring* FWS to consider and in many cases defer to—undefined "credible information" of an economic or other impact supporting an exclusion, 91 Fed. Reg. at 45,682;

c. FWS failed to adequately consider the impacts to listed species and critical habitat of giving undue weight to outside sources with undefined "expert or first-hand knowledge," even as to subjects in which FWS has more expertise, unless FWS has "knowledge or material evidence that rebuts that information." 91 Fed. Reg. at 45,682. FWS failed to explain how it will determine what constitutes "expert or first-hand knowledge," whether it has sufficient knowledge or evidence to rebut such outside information, what quantum of knowledge or evidence will be sufficient to do so, and whether FWS will now need to devote resources to the consideration of outside information. FWS also failed to explain how these additional considerations will allow it to satisfy its statutory mandate to promote the ESA's core purposes, including designating critical habitat necessary for species recovery;

d. FWS failed to justify its departure from its formal policy, articulated in 2016, of generally *not* excluding federal lands from critical habitat designations, in recognition of the high conservation value of designating critical habitat on federal lands. 91 Fed. Reg. at 45,665. Instead, FWS offered only a conclusory assertion that its position is not foreclosed by the ESA, and that Section 4(b)(2) "does not provide for a different standard for exclusions on Federal lands

relative to other lands." *Id*. at 45,673. FWS provided no further explanation of why its 2016 conclusion that federal lands are important for species recovery no longer applies in 2026, rendering its rationale arbitrary and capricious; and

e. FWS failed to consider how the Habitat Exclusion Rule adversely affects the ESA's policy of institutionalized caution and its species recovery mandate given the likely increase in areas that will be excluded from critical habitat designations and the likely commensurate decrease in Section 7 consultations and associated alternatives and mitigation measures for the impacts of federal agency actions on designated critical habitat areas.

171. Accordingly, FWS acted in a manner that was arbitrary, capricious, and an abuse of discretion, and failed to follow the procedures required by law, in violation of the APA. 5 U.S.C. § 706. Consequently, the Habitat Exclusion Rule should be held unlawful and set aside.

**FIFTH CAUSE OF ACTION**
**(Violation of NEPA and the APA—4(d) and Habitat Exclusion Rules, 42 U.S.C. § 4332(2)(C); 5 U.S.C. § 706)**

172. Paragraphs 1 through 171 are realleged and incorporated herein by reference.

173. NEPA requires federal agencies to take a "hard look" at the environmental consequences of a proposed activity before acting. To achieve that purpose, a federal agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Where an agency's action "does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," the agency must complete an EA. *Id*. § 4336(b)(2).

174. The Final Rules are major federal actions that will have significant effects on the quality of the human environment through harm to endangered and threatened species and their critical habitat. FWS improperly invokes a categorical exclusion, claiming that it is not required to prepare an EIS or EA under NEPA, and further improperly claims that extraordinary circumstances (which would prohibit the use of a categorical exclusion) are not present here. These actions are arbitrary and capricious, an abuse of discretion, and contrary to the requirements of NEPA and the APA.

175. The 4(d) Rule will indisputably leave threatened species more vulnerable by eliminating the blanket Section 4(d) rule, which promoted the ESA's core purpose by ensuring that "there is never a lapse in species protections." 89 Fed. Reg. at 23,921. Further, the regulations suggest that FWS could refuse to promulgate a species-specific rule or could promulgate such a rule long after the relevant final listing or reclassification determination, leaving such species vulnerable to significant impacts from myriad human activities. This delay also could increase the risk of threatened species sliding closer to endangered status. FWS's assertion that the 4(d) Rule will not have significant effects on the environment "[b]ecause it is purely a regulatory framework to be used by FWS when crafting future protective regulations" arbitrarily and unjustifiably ignores these realities. 4(d) Rule Categorical Exclusion Documentation, Doc. ID FWS-HQ-ES-2025-0029-14626, at 5.

176. The Habitat Exclusion Rule is likely to limit the extent of critical habitat designations and thus reduce the ESA's protections for endangered and threatened species associated with such designations, particularly via the Section 7 consultation process. The Rule's focus on, *inter alia*, allowing proponents of habitat exclusions to submit information that must be presumed correct, and allowing exclusion of federal lands and lands subject to Section 10 permits and other agreements from designations of critical habitat, for example, indicates an intent to dramatically reduce the scope of critical habitat designated. *See* 90 Fed. Reg. at 52,596 (citing 81 Fed. Reg. at 7226 (Feb. 11, 2016)). FWS's assertion that the Habitat Exclusion Rule will not have significant effects on the environment "[b]ecause it is purely a regulatory framework to be used by FWS when making future critical habitat designations," again ignores these practical, real-world effects of the rule. Habitat Exclusion Rule Categorical Exclusion Documentation, Doc. ID FWS-HQ-ES-2025-0048-12537, at 5.

177. Because of these significant, direct, indirect, and cumulative environmental impacts on imperiled species and their habitat, the NEPA categorical exclusion for policies and regulations of an administrative or procedural nature, 43 C.F.R. § 46.210(i), does not apply, as categorical exclusions are only available for actions that "normally do [] not significantly affect the quality of the human environment." 42 U.S.C. § 4336e(1).

178. Further, the presence of extraordinary circumstances can convert an action that normally does not have significant impacts into an action that does have significant environmental effects, rendering any reliance on a categorical exclusion unlawful. 43 C.F.R. § 46.205(c)(1). Here, even if a categorical exclusion applied, "extraordinary circumstances" prevent application of such categorical exclusion, including but not limited to the Final Rules' impacts on listed species and critical habitat. *See id.* § 46.215(g).

179. There are extraordinary circumstances here because the Final Rules "[h]ave a direct relationship to other actions that implicate potentially significant environmental effects," *id.* § 46.215(e), namely, the other flawed rules proposed on November 21, 2025, "Interagency Cooperation Regulations" and "Listing Endangered and Threatened Species and Designating Critical Habitat," as well as the rule entitled "Rescinding the Definition of 'Harm' Under the Endangered Species Act," promulgated on July 14, 2026. 90 Fed. Reg. 52,600 (Nov. 21, 2025); 90 Fed. Reg. 52,607 (Nov. 21, 2025); 91 Fed. Reg. 43,300 (July 14, 2026). "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). As multiple extraordinary circumstances apply to these Final Rules, FWS may not properly find that a categorical exclusion applies.

180. Consequently, the Final Rules constitute discretionary "major federal action[s]" that significantly affect the quality of the human environment, and that are not subject to any categorical exclusion, thus requiring preparation of an EIS, or at the very least, an EA, prior to finalization of the rules.

181. In sum, FWS's failure to take a "hard look" at the environmental impacts of the Final Rules in an EIS or EA, and its determination that the Final Rules are subject to a categorial exclusion, was arbitrary and capricious, an abuse of discretion, and contrary to the requirements of NEPA and the APA. 5 U.S.C. § 706(2); 42 U.S.C. § 4332(2)(C). Consequently, the Final Rules should be held unlawful and set aside.

## PRAYER FOR RELIEF

WHEREFORE, State Plaintiffs respectfully request that this Court:

1. Issue a declaratory judgment that FWS violated the ESA and the APA by acting arbitrarily, capriciously, and contrary to law, abusing its discretion, and acting in excess of its statutory jurisdiction and authority in promulgating the Final Rules;

2. Issue a declaratory judgment that FWS violated NEPA and the APA by acting arbitrarily, capriciously, and contrary to law, abusing its discretion, and acting in violation of the environmental review procedures required by law in promulgating the Final Rules;

3. Issue an order vacating FWS's unlawful issuance of the Final Rules;

4. Award State Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

5. Award such other relief as the Court deems just and proper.

Dated: September 9, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
LAURA J. ZUCKERMAN
Supervising Deputy Attorney General

*/s/ Jennifer Loda*
JENNIFER LODA
TARA MUELLER
HEATHER M. LEWIS
SUSANA AGUILERA
Deputy Attorneys General
Deputy Attorneys General
1515 Clay Street, 20th Floor
Oakland, CA 94612
Telephone: (510) 879-3433
Fax: (510) 622-2270
E-mail: Jennifer.Loda@doj.ca.gov

*Attorneys for Plaintiff State of California*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Michele Hunton*
MICHELE HUNTON*
ZEUS SMITH*
Assistant Attorneys General
Office of the Attorney General
Environmental Protection Division
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
E-mail: Michele.Hunton@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

NICK BROWN
Attorney General of Washington

*/s/ Maggie Baker Smith*
MAGGIE BAKER SMITH*
ELIZABETH M. HARRIS*
Assistant Attorneys General
Washington Attorney General's Office
Environmental Protection Division
800 5th Ave., Suite 2000, TB-14
Seattle, WA 98104-3188
Telephone: (360) 582-6569
E-mail: Maggie.Smith@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ Steven J. Goldstein*
STEVEN J. GOLDSTEIN*
Assistant Attorney General
Office of the Attorney General of Maryland
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Telephone: 410-576-6414
E-mail: sgoldstein@oag.maryland.gov

*Attorney for Plaintiff State of Maryland*

KRISTIN K. MAYES
Attorney General of Arizona

/s/ Anthony C. Proano
ANTHONY C. PROANO*
Special Assistant Attorney General
Office of the Arizona Attorney General
Environmental Protection Unit
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-7753
E-mail: Anthony.Proano@azag.gov

*Attorneys for Plaintiff State of Arizona*

KATHLEEN JENNINGS
Attorney General of the State of Delaware

/s/ Vanessa L. Kassab
IAN R. LISTON
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB*
Deputy Attorneys General
ROBIN L. JACOBS
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
Telephone: (302) 683-8899
E-mail: vanessa.kassab@delaware.gov

*Attorneys for Plaintiff State of Delaware*

PHILIP J. WEISER
Attorney General of Colorado

/s/ Christopher Breidenbach
CARRIE NOTEBOOM*
Assistant Deputy Attorney General
CHRISTOPHER BREIDENBACH*
Senior Assistant Attorney General
Natural Resources and Environment Section
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: 720-508-6285
E-mail: Carrie.Noteboom@coag.gov

*Attorneys for State of Colorado*

ANNE LOPEZ
Attorney General of Hawai‘i

/s/ Danica Patel
DANICA PATEL*
Deputy Attorney General
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-1500
Fax: (808) 586-1239
E-mail: Danica.L.Patel@hawaii.gov

*Attorney for Plaintiff State of Hawai‘i*

WILLIAM TONG
Attorney General of Connecticut

/s/ Daniel M. Salton
DANIEL M. SALTON*
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5250
E-mail: daniel.salton@ct.gov

*Attorney for Plaintiff State of Connecticut*

KWAME RAOUL
Attorney General of Illinois

/s/ Joanna K. Brinkman
JOANNA K. BRINKMAN*
Complex Litigation Counsel
JASON E. JAMES
Assistant Attorney General
ROGER JOHNSON
Assistant Attorney General
Illinois Attorney General's Office
115 S. LaSalle St.
Chicago, IL 60603
Telephone: 312-814-3033
E-mail: joanna.brinkman@ilag.gov

*Attorneys for Plaintiff State of Illinois*

DANA NESSEL
Attorney General of Michigan

/s/ Nathan A. Gambill
NATHAN A. GAMBILL*
Assistant Attorney General
Michigan Department of Attorney General
Environment, Natural Resources,
and Agriculture Division
P.O. Box 30755
Lansing, MI 48909
Telephone: (517) 335-7664
E-mail: gambilln@michigan.gov

*Attorney for the State of Michigan*

RAÚL TORREZ
Attorney General of New Mexico

/s/ J. Spenser Lotz
J. SPENSER LOTZ*
Assistant Attorney General
Environmental Protection Bureau
201 Third St. NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 616-7560
E-mail: slotz@nmdoj.gov

*Attorney for Plaintiff State of New Mexico*

KEITH ELLISON
Attorney General of Minnesota

/s/ Cat Rios-Keating
CAT RIOS-KEATING*
Special Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 300-7302
E-mail: catherine.rios-keating@ag.state.mn.us

*Attorney for Plaintiff State of Minnesota*

LETITIA JAMES
Attorney General of New York

/s/ Laura Mirman-Heslin
LAURA MIRMAN-HESLIN*
Assistant Attorney General
Office of the New York State Attorney General
Environmental Protection Bureau
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-6091
E-mail: Laura.Mirman-Heslin@ag.ny.gov

*Attorney for Plaintiff State of New York*

JENNIFER DAVENPORT
Attorney General of New Jersey

/s/ Lisa J. Morelli
LISA J. MORELLI, State Bar No. 137092
ALANA V. PACCIONE*
Deputy Attorneys General
New Jersey Division of Law
25 Market Street
Trenton, New Jersey 08625
Telephone: (609) 376-2740
E-mail: Lisa.Morelli@law.njoag.gov

*Attorneys for Plaintiff State of New Jersey*

DAN RAYFIELD
Attorney General of Oregon

/s/ Paul Garrahan
PAUL GARRAHAN*
Sr. Assistant Attorney General
Oregon Department of Justice
Natural Resources Section
1162 Court Street NE
Salem, Oregon 97301-4096
Telephone: (503) 947-4540
E-mail: Paul.Garrahan@doj.oregon.gov

*Attorney for Plaintiff State of Oregon*

PETER F. NERONHA
Attorney General of Rhode Island

/s/ Nicholas M. Vaz
NICHOLAS M. VAZ*
Assistant Attorney General
Rhode Island Office of the Attorney General
Environment and Energy Unit Chief
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400 ext. 2297
E-mail: nvaz@riag.ri.gov

*Attorney for Plaintiff State of Rhode Island*

JOSHUA L. KAUL
Attorney General of Wisconsin

/s/ Kevin Grzebielski
KEVIN L. GRZEBIELSKI*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
Telephone: (608) 266-7234
Email: Kevin.Grzebielski@wisdoj.gov

*Attorney for Plaintiff State of Wisconsin*

CHARITY R. CLARK
Attorney General of Vermont

/s/ Justin G. Sherman
JUSTIN G. SHERMAN*
Assistant Attorney General
Vermont Attorney General's Office
Environmental and Public Protection Division
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-5621
E-mail: justin.sherman@vermont.gov

*Attorney for Plaintiff State of Vermont*

BRIAN L. SCHWALB
Attorney General for the District of Columbia

/s/ Coty Montag
COTY MONTAG, State Bar No. 255703
Deputy Attorney General
LAUREN MARKS
Special Assistant Attorney General
KATHRYN BLANCO
Assistant Attorney General
400 6th Street NW Washington, D.C. 20001
Telephone: 202-256-3713
E-mail: Coty.Montag@dc.gov

*Attorneys for Plaintiff District of Columbia*

JAY JONES
Attorney General for the Commonwealth of Virginia

/s/ Megan C. Keenan
MEGAN C. KEENAN*
Deputy Solicitor General
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 997-5222
E-mail: mkeenan@oag.state.va.us

*Attorney for Plaintiff Commonwealth of Virginia*

**Application for admission pro hac vice forthcoming*